IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 93-2600

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GILBERT MARTINEZ MUSQUIZ and
ROBERT MARTINEZ GATEWOOD,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

(February 10, 1995)

Before POLITZ, Chief Judge, and HIGGINBOTHAM and DeMOSS, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Robert Martinez Gatewood and Gilbert Martinez Musquiz appeal
their criminal convictions on cocaine charges, urging that their
conduct was misread--they were not dealing but trying to collect
DEA reward money by turning in drug dealers.  The main issue now is
whether the trial court should have allowed the prosecutor to
cross-examine Musquiz about why he failed to offer this explanation
and instead remained silent after he was arrested and before
receiving <u>Miranda</u> warnings.  We hold that the questions were
permissible, reject other contentions, and affirm.

In the spring of 1990, Robert Gatewood, a police officer in Houston, asked retired officer James Montero if he would like to make money by stealing from drug dealers. Gatewood told Montero that during a 1988 homicide investigation of some Colombians, he and another officer had found and shared between $200,000 and $300,000. Montero replied that he wanted no part in such a scheme.

The Houston Police Department suspended Gatewood in November 1990. Beginning in January 1991, Gatewood repeatedly asked his friend, Ana Maria Jaramillo, to find out from her imprisoned son the names of Colombian drug dealers. Gatewood explained that he and his confederates could steal drugs and money by posing as police officers, and that the Colombians would be unable to report their losses to the police.

Undercover DEA agents Frank "Mike" McDaniel and Jerry Garner arranged a meeting for September 25, 1991, at which a man named Carlos was to deliver 100 kilograms of cocaine to a man named Pacho. Carlos was a confidential DEA informant. Mario Jaramillo was to supply the cocaine to Carlos, and Ana Maria acted as Mario's agent. McDaniel and Garner told Carlos and Ana Maria about the meeting, and Ana Maria told Gatewood and Mario. Ana Maria did not know where the meeting would be, so she told Gatewood to follow Carlos to the meeting.

On September 25, Carlos and Pacho met at a TGI Friday's restaurant in Houston. Narcotics task force agents were stationed outside. Surveillance agents saw Gatewood follow Carlos to the

restaurant and wait outside in his Pontiac Grand Am while watching the restaurant. Gatewood spoke on a cellular phone for a while. Steve Garza, a former Houston police officer, pulled up in a Chevrolet Caprice next to the Grand Am and spoke with Gatewood. Then Gilbert Musquiz, Gatewood's cousin, walked up to the Grand Am and spoke with Garza and Gatewood. The three men drove around the restaurant for a while and watched it, following Pacho when he drove off in his Mazda.

Later that same day, McDaniel and Garner went to a Holiday Inn to arrange for the drug delivery. They spotted Garza's Chevrolet Caprice at the parking lot and so called off the delivery. McDaniel told Ana Maria that he had spotted the Caprice at the Holiday Inn, whereupon Ana Maria called Gatewood to relay this information. The Caprice then left the lot.

On October 7, McDaniel and Garner introduced Ana Maria to undercover agent Robert Boudreau, who arranged to deliver cocaine to her the next day. On October 8, Ana Maria and another man met Boudreau, and they were arrested. Ana Maria agreed to cooperate with the authorities. On October 9, Ana Maria called Gatewood and told him that some Colombians had bought 114 kilograms of cocaine. She said that they had stashed it in their Chevrolet Suburban truck with Mississippi plates in the parking lot of the Adam's Mark Hotel in Houston. Garza and Musquiz soon drove up to the Adam's Mark Hotel in Garza's Caprice, and Gatewood drove up in his Grand Am. Gatewood called Ana Maria from his cellular phone several times, telling her: "We're going to go after it." An undercover agent

3

left the hotel, put a suitcase in the Suburban's trunk, drove to a nearby shopping mall, put the keys inside the truck's gas cap, and entered a nearby restaurant. Garza, Musquiz, and Gatewood followed the Suburban to the mall and watched it. Gatewood repeatedly telephoned Ana Maria, and she told him that the keys had been left in the ashtray in the past. Musquiz got into Gatewood's Grand Am. Gatewood and Musquiz pulled up alongside the Suburban. Musquiz was wearing a police raid jacket and black leather gloves and carrying a security guard's badge, even though it was a hot day and Musquiz had never been a police officer or security guard. After almost two hours of surveillance, Musquiz got out of the Grand Am and walked around the Suburban, checking the tops of the tires and pulling on door handles. Agents then arrested Gatewood and Musquiz. Garza fled but turned himself in one week later. Officers found a loaded revolver under Gatewood's driver's seat.

A federal jury convicted Garza, Gatewood, and Musquiz of conspiracy to possess cocaine with intent to distribute. Gatewood was also convicted of using a communication facility in the course of committing a drug trafficking offense. All three defendants argued unsuccessfully that they were just trying to collect DEA reward money by turning in narcotics dealers. Gatewood and Musquiz now appeal.

## II.

Defense counsel by a motion in limine asked the court to instruct the prosecutor not to question Musquiz about his silence

4

in the interval between arrest and *Miranda* warnings. The trial judge denied the motion. Musquiz testified on direct examination that he was just trying to earn a reward for turning in drug traffickers. The prosecutor cross-examined Musquiz about his not offering this explanation when he was arrested.

Musquiz relies on United States v. Henderson, 565 F.2d 900 (5th Cir. 1978). *Henderson* turned on the balance to be struck between probative value and prejudice under the rules of evidence. Henderson, a prisoner, was silent when searched for marijuana. *Miranda* warnings came after the search. After *Miranda* warnings, Henderson gave his explanation, the same explanation he offered at trial. The court held it was reversible error to attack Henderson's explanation by stressing in closing argument his silence when confronted by officials. Id. at 905-06. The panel concluded that the comment was highly prejudicial and lacked significant probative value, since Henderson's silence was consistent with his explanation at trial. Id. at 905. Concluding that on these facts the prejudice outweighed the minimal probative value, the panel reversed Henderson's conviction. Id. at 905-06; see also United States v. Impson, 531 F.2d 274, 277-78 (5th Cir. 1976). *Henderson* and *Impson*, on which it relied, reflect hostility toward prosecutorial use of a defendant's silence. That hostility seems to have flourished against the backdrop of an expansive vision of a defendant's rights under the Fifth Amendment, although the opinions do not offer that explanation. Whatever the source, it found expression both in their balancing of prejudice and

5

probative value and in the absence of deference given the trial court's ruling. Laying aside the correctness of the appellate role they implicitly assume, these decisions yield no ruling or holding binding on later panels of this court. Rather, they are case specific and fact bound. We would be consistent with Henderson and Impson in our holding today even if the legal matrix in which the balance is to be struck had not changed. It has.

The Supreme Court and other courts of appeals do not, at least now, share the Henderson panel's unwillingness to give much, if any, weight to the probative value of a defendant's silence. Indeed, Henderson and Impson refused to recognize the difference between silence before a Miranda warning and silence after a defendant has been told that he may remain silent and his silence will not be used against him. This worked an extension of Miranda's bite by giving silence little, if any, probative value and blurring the distinction between silence before and silence after a Miranda warning.

Since Henderson, the Supreme Court, using the same framework of probative value and prejudice, has recognized that "[s]uch [post-arrest, pre-Miranda] silence is probative." Brecht v. Abrahamson, 113 S. Ct. 1710, 1716 (1993). It has distinguished post-warning silence, holding that a Miranda warning that a suspect need not make a statement makes the use of silence both unfair and unreliable because the warnings "induce[] silence by implicitly assuring the defendant that his silence [will] not be used against him." Fletcher v. Weir, 455 U.S. 603, 606 (1982) (per curiam);

6

accord <u>Anderson v. Charles</u>, 447 U.S. 404, 407-08 (1980).  Indeed, the Court has found that pre-<u>Miranda</u> silence can be highly probative precisely because it implicates no such assurances. <u>Fletcher</u>, 455 U.S. at 607; <u>Brecht</u>, 113 S. Ct. at 1716; <u>see also</u> <u>United States v. Butler</u>, 924 F.2d 1124, 1129 (D.C. Cir.) (holding post-arrest, pre-<u>Miranda</u> silence admissible in federal trial), <u>cert. denied</u>, 502 U.S. 871 (1991); <u>United States v. Rivera</u>, 944 F.2d 1563, 1568 (11th Cir. 1991) (same, in case where witness made comments in prosecution's case-in-chief).

On these facts, a reasonable juror may have supposed that Musquiz would have explained when confronted by the police if he was in fact trying to assist the police in catching drug dealers. The district court acted well within its discretion in allowing the cross-examination.  Given the deference due the trial court ruling, we cannot conclude that the probative value of Musquiz's silence was substantially outweighed by the danger of unfair prejudice.  We find no error in the admission of this evidence.  In doing so we announce no broad rule of evidence.  The admission of evidence that a defendant remained silent on arrest and before a <u>Miranda</u> warning

turns on fact specific weighing by the trial judge.  See Fed. R. Evid. 403.

### III.

Gatewood argues that the district court should have excluded his 1990 statements to James Montero about a plan to steal money from drug dealers and his 1988 theft during a homicide investigation.  This evidence is relevant to Gatewood's intent, knowledge, plan, and absence of mistake or accident.  See Fed. R. Evid. 404(b).  It negates his claim that he was only trying to catch drug dealers to earn reward money.  Gatewood argues that his actions in 1988 and statements in 1990 are too remote to shed light on his intent in 1991.  We cannot say that these events are so remote that the evidence lacks any probative value.

At Musquiz's request, the court gave a limiting instruction that the proof of the 1988 theft was admissible only against Gatewood and then only on the issue of intent.  Musquiz argues, however, that the instructions on conspiracy prejudiced him because they stated that conspiracy "is a kind of 'partnership in crime' in which each member becomes the agent of every other member."  Thus, he claims, the jury could have used the previous theft against Musquiz by imputing Gatewood's intent to Musquiz.  Musquiz moved for severance, but the district court denied the motion.

Defendants who are indicted together should generally be tried together, particularly in conspiracy cases.  "[A] district court should grant a severance under Rule 14 only if there is a serious

8

risk that a joint trial would compromise a specific trial right of one of the defendants . . . ." Zafiro v. United States, 113 S. Ct. 933, 938 (1993). We review for abuse of discretion. Here, the district court was well within its discretion in relying on limiting instructions. We presume that jurors follow the law. Evidence of one defendant's past crimes "does not ordinarily justify severance," even though it is inadmissible against a codefendant. United States v. Rocha, 916 F.2d 219, 228 (5th Cir. 1990), cert. denied, 500 U.S. 934 (1991). The prosecutor did not try to ascribe Gatewood's theft to Musquiz. In light of the explicit limiting instruction, the claimed link between the conspiracy instruction and the spillover guilt is too tenuous to amount to a serious risk of prejudice. There was no abuse of discretion.

IV.

Gatewood asks this court to reverse his convictions because voir dire developed the fact that veniremember number seven had doubts about her ability to be fair and impartial. At the close of voir dire, Gatewood's attorney said that he would challenge this member of the venire for cause, but then said: "Tell you what, we will withdraw the challenge on [number seven]." Gatewood's attorney then made four other for-cause challenges, and the judge granted all four. Neither party challenged number seven for cause or peremptorily, and she became the foreperson of the jury.

9

By withdrawing the challenge, Gatewood waived his objection. Waived errors are entirely unreviewable, unlike forfeited errors, which are reviewable for plain error. United States v. Calverly, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), petition for cert. filed, -- U.S.L.W. -- (U.S. January 18, 1995) (No. 94-7792). In any event, the error was not plain because number seven clarified her answers and expressed a willingness to follow the law and instructions.

V.

The district court denied access to FBI records of rewards paid informants during 1990 and 1991. Defendants urge that this lack of access frustrated their right to confront the witnesses against them. Gatewood argues that this refusal impaired his ability to cross-examine Ana Maria regarding her motives for testifying. Musquiz argues that it impeded his defense that his intent in helping Gatewood was to earn a reward.

In the government's case-in-chief, DEA agent McDaniel testified that the DEA often rewarded informants based on the number of defendants, the quantity of drugs seized, and the quality of the case. At the close of the government's case, Musquiz subpoenaed the DEA records. The court quashed the subpoena pending further consideration, persuaded that amounts paid in the past were not relevant but that DEA policy regarding payment of rewards might be relevant. During Musquiz's case, retired DEA agent Paul Herring testified that an informant's tip that led to seizure of 114

kilograms of cocaine would merit a reward of between $10,000 and $20,000. Musquiz renewed his request for records, and the government stated that it was willing to stipulate that rewards had been paid. After reviewing the records in camera, the court denied the motion because the records were irrelevant and uncontradicted testimony had already established the size of DEA rewards. Because the records would have been duplicative and at best tangentially relevant, the district court did not abuse its discretion.

Gatewood argues that he needed the DEA reports to contradict Ana Maria's testimony that she had never been a government informant and to prove her ulterior financial motive for testifying against Gatewood. Before trial, however, the government gave the defense an informant payment sheet showing payments it had made to Ana Maria to reimburse her expenses. McDaniel testified that the DEA had not paid her a reward but had reimbursed her expenses and made monthly subsistence payments to her during the investigation. He also testified that she had not been paid anything for this case, because there had been no expenses, and that she was still on the DEA payroll. DEA agent Boudreau testified that the DEA had paid Ana Maria $67,174.93 for assistance in investigating Colombians, of which $25,957.46 was subsistence payments and the rest expense reimbursements. Boudreau also testified that Ana Maria had received no reward. The district court then denied the request for the underlying documents and reviewed the records in camera, satisfying itself that the defense had not been deprived of any significant information. The prosecutor tendered copies of the

11

DEA forms to the defense, who used these forms in cross-examining Ana Maria. The defense attorneys questioned her at length about DEA payments, the terms of her plea agreement, and her reasons for cooperating with the government. In short, Gatewood had enough information for cross-examination.

## VI.

Gatewood makes four challenges to the district court's application of the Sentencing Guidelines. First, he contests the application of a two-point sentencing enhancement for use of a gun during a drug offense under U.S.S.G. § 2D1.1(b)(1). He argues that because the gun was found under the seat of his car, it was not involved in this offense. Application Note 3 to that Guideline states: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The district court's factual finding that the weapon was connected with the offense was not clearly erroneous.

Second, Gatewood argues that the district court should not have enhanced his sentence by two levels for his leadership role in the crime under U.S.S.G. § 3B1.1(c). But it was Gatewood's idea to steal from drug dealers. Gatewood asked Ana Maria to find traffickers. Gatewood recruited Garza and Musquiz. Gatewood made calls to Ana Maria on his cellular phone, finding out the minutiae about the Suburban and its drug contents. Gatewood told Garza and Musquiz to come to the Adam's Mark Hotel, and he directed the

12

surveillance.  Gatewood ordered Musquiz to go examine the Suburban. Even though the three men planned to split the proceeds equally, the finding of a leadership role was not clearly erroneous.

Third, Gatewood claims that he deserved a downward departure under U.S.S.G. § 5K2.0 because the government manipulated drug quantity, greatly overstating his criminal involvement.  We find no impermissible manipulation.  When told of the 114 kilograms of cocaine, Gatewood rushed to the Adam's Mark Hotel to prepare to steal it.  He argues that he could not have transported or sold that much cocaine, but he told Ana Maria that he knew someone who could sell the cocaine for him and could have used the Suburban to transport the drugs.

Gatewood's final complaint about his sentence is that the district court mistakenly thought it lacked the authority to depart downward.  The contention is not supported by the record.


VII.

Gatewood's last two arguments are that 1) the evidence was insufficient to support his convictions for conspiracy to possess cocaine with intent to distribute and use of a telephone to facilitate a drug offense, and 2) the evidence was insufficient to establish probable cause to arrest him, requiring suppression of his statements and evidence seized from his car.  Both arguments attack Ana Maria's credibility and reassert the claim that Gatewood was only trying to earn reward money.  We find that the evidence of

13

the proposition to Montero, the statements to Ana Maria, the careful and repeated maneuvers by Musquiz, Garza, and Gatewood, and the many telephone calls to Ana Maria summed to probable cause and evidence sufficient to sustain the convictions.

AFFIRMED.