**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 96-20831**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**JOSEPH READE POWELL, JR.,**

**Defendant-Appellant.**

Appeal from the United States District Court
For the Southern District of Texas

September 24, 1997

Before KING, DAVIS, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal rises from the conviction of Joseph Reade Powell, Jr. for evading federal fuel excise taxes. Powell contests the admission of certain items of evidence and the application of the United States Sentencing Guidelines. We affirm the judgment of the district court.

I. FACTUAL BACKGROUND

From approximately July 1986 through 1991, Joseph Powell operated a wholesale distributorship of gasoline and diesel products named J.P. Energy. Powell bought a building in Kingswood,

Texas, in which he maintained his offices.  He sold gasoline and diesel fuel to retail outlets, such as convenience stores, service stations, and truck stops in and around Houston, Texas.

In the late 1980s, the federal government and the State of Texas offered excise tax reduction programs for gasohol producers.[1] On July 21, 1988, Powell registered with the Internal Revenue Service as a gasohol producer.  He obtained a Form 637, which enabled him to purchase gasoline at a reduced rate of excise tax beginning on July 25, 1988.

Under the federal program, a person who was buying gasoline to blend it into gasohol could obtain authorization to buy gasoline from his suppliers at a reduced rate of tax.  In order to obtain his Form 637, Powell represented to the IRS that he was going to blend gasoline to make gasohol.  The registration Powell received warned him about the legal consequences of misusing the certificate.  Powell was required to blend the gasoline into gasohol within twenty-four hours, and if he failed to do so he would become liable for the difference between the reduced rate of tax he paid and the full excise tax rate.  During 1989 and 1990, that difference was 5.6 cents per gallon.  Powell was also obligated to file a Federal Quarterly Excise Tax Return (Form 720) for each quarter.

Powell also registered to buy diesel fuel and heating oil tax-free on September 19, 1988.  He became eligible to buy these fuels

---

[1]  Gasohol is a product made through the addition of ethanol or alcohol, which are octane enhancers, to low grades of gasoline with low octane ratings.

tax-free on October 31, 1988. In order to obtain this registration, Powell represented that he would act as a wholesale distributor of diesel fuel. Powell was obligated to notify the IRS if his business changed, but he never notified the IRS that he was using the Form 637 for a purpose other than the one he claimed on his application.

During 1988, less than one percent of Powell's sales involved gasohol or ethanol. Powell bought ethanol from Koch Industries, Inc. ("Koch"), and Petdon, which was owned by Powell's friend Tom Petty. Petty stopped supplying Powell with ethanol in March 1988, and Powell stopped buying ethanol from Koch in December 1988. Powell nevertheless continued to use his Form 637 to buy gasoline at the reduced rate of federal excise tax for gasohol blenders. He also continued to use his other Form 637 to buy diesel fuel tax-free. Powell sold these products to his retail customers, whom he charged the full rates of federal and state excise tax on both types of fuel.

In 1988, Powell contacted Oscar Lee Martin and entered into an agreement whereby Powell would receive ethanol produced by Martin's grain processing plant, Livingston Steam Power, in exchange for paying the expenses of the plant, the notes on the equipment, and a small salary for Martin. Powell told Martin that he (Powell) had the facilities to blend ethanol with gasoline and that it would be very profitable for him (Powell) to have a source of ethanol. In 1988 and part of 1989, the plant never produced more than a total of six to eight loads of ethanol. Powell received three of the

loads of ethanol in 1988; the others were sold to other buyers because Powell told Martin that he (Powell) did not need the ethanol.

Powell put a fax machine and a new telephone line in Martin's house because Powell wanted Martin to send him records so Powell would "have a paper trail for his auditors." On September 29, 1988, Powell faxed to Martin a copy of an invoice that was different in form from the one Livingston Steam Power used and that did not meet the state requirements. The invoice described a delivery by Livingston Steam Power of 8,063 gallons of ethanol purportedly made by Martin's truck. The delivery had never occurred; Martin did not even own a truck. Martin confronted Powell in his (Martin's) front yard, and told Powell that he did not have invoices like the one faxed by Powell, that such invoices did not comport with state law, and that Powell should not send him invoices any more. Martin testified that the State of Texas required him to keep certain records in order to sell a load of ethanol. All of the ethanol going into the truck had to be measured by meter, and the operator had to sign the meter ticket and invoice, including on the invoice the number of the trailer containing the ethanol. Martin testified that he never gave anyone any ethanol without generating these documents. Powell had a stack of similar invoices that he wanted Martin to use to keep a paper trail in the event of an audit. Martin told Powell that he could not use those invoices and not to send them any more.

Martin closed the grain processing plant in January 1989. The plant closed permanently in September or October 1989. Powell told Chuck Henderson, a business associate who participated in Powell's scheme to evade taxes, that it did not make any difference whether Livingston Steam Power worked or not. Powell told Henderson that Livingston Steam Power gave him a vehicle to show that he manufactured ethanol so that he could get the tax credit for blending.

In 1989, Powell continued to purchase gasoline at the reduced federal excise tax rate of 3.44 cents per gallon reserved for gasohol producers, and he sold the gasoline, unblended, to retail outlets. Powell charged his customers the full rate of 9.1 cents per gallon federal excise tax, and the full rate of state excise taxes on gasoline. He kept the difference.

Powell formed a second company, JLK Transport, which he incorporated, in order to transport fuel to his customers. Powell formed a separate company to transport fuel so that he could better determine whether he was making or losing money on transportation. JLK Transport was run for Powell by Charles Henderson, who pleaded guilty in August 1995 to state organized-criminal-activity charges concerning his failure to pay fuel tax.

Henderson did business with Powell in the late 1980s and early 1990s, after Powell approached Henderson and offered to sell him fuel. Henderson sold only gasoline and diesel fuel, no gasohol, from his service stations. Henderson bought only gasoline and

diesel fuel from Powell. Powell charged Henderson excise tax on both gasoline and diesel fuel.

Henderson and Powell became friends, and Henderson bought fuel from and delivered fuel for Powell's company. Their business arrangement was that Powell would handle the fuel orders and Henderson would handle the deliveries, and each would pick up some of the checks and money. They agreed that Henderson would run JLK Transport out of Henderson's office, and Powell would pay Henderson for transporting the fuel. Henderson leased five trucks from Raymond Young, and Powell co-signed a note so that Henderson could buy another truck. Henderson paid off the note on that truck. Powell gave Henderson the title of vice-president for signing paperwork. Powell gave Henderson transport tickets, letterhead, and other paperwork necessary to run JLK Transport at his office. Powell had a fuel card, and he gave other fuel cards to the drivers or left them in the office for the drivers. Henderson testified that he and Young transported fuel under the name JLK Transport with Powell's "complete approval." Powell kept track of freight expenses on a spreadsheet. This arrangement lasted until April 1990.

Henderson and Powell discussed blending fuel with ethanol and the corresponding tax credits. Powell told Henderson that he got a tax credit from the government for blending fuel, which allowed him to sell fuel an average of five cents below rack prices.

Henderson never stored any fuel for Powell, and he never stored any ethanol in his tanks nor sold any ethanol to Powell.

-6-

Henderson sometimes blended diesel fuel and barge strippings, and sometimes blended gasoline, but he never blended gasoline with ethanol. Four drivers who delivered fuel for JLK Transport in 1989 and 1990 testified that during the time they delivered fuel for Powell, they delivered only gasoline and diesel fuel to truck stops, convenience stores, and service stations. These drivers never blended gasoline with ethanol. Three of the drivers had never transported ethanol for Powell, and the fourth driver had only done so on one occasion, when he picked up a load at Livingston Steam Power.

Between June 1989 and September 1989, Young, from whom Henderson had leased five trucks, came in and took over Henderson's business. Young arranged credit on credit transactions, collected the money, paid Henderson for his equity share of business, and paid the bills. Young used the name of one of Henderson's companies, Travel Stop, for Young's stations in Louisiana. Faye Bartniski, who had kept Young's books, came to work at Henderson's offices to keep the books for their business venture. Henderson and Bartniski sent more than $25,000 in cash at a time to Young by an overnight delivery service in order for Young to pay the bills. The business relationship that developed between Powell and Young was cordial.

In 1990, Powell continued using his Forms 637 to buy gasoline at the reduced rate and to buy diesel tax-free, and he continued to sell that fuel to gas stations and truck stops in the Houston area, while charging for the full rates of federal and state excise

taxes. Powell's employees would record sales to service stations and truck stops, but Powell would later change his business records to show those sales as made to "DTM," purportedly a fuel exporter, at a shipyard in Bourg, Louisiana. DTM, or "Dry Tortugas Marina," was a small company in Marco Island, Florida that Young's brother operated for Young to sell fuel to fishing boats. DTM belonged solely to Young.[2] The drivers who Powell showed as making the deliveries to DTM had never been to Bourg; one driver had never been outside the State of Texas.

During the prosecution period, 1989 through the first quarter of 1990, Powell filed or caused his in-house accountant, Bryan Reasonover, to file monthly excise tax returns with the State of Texas that underreported his taxable sales of gasoline, did not report any sales of ethanol or gasohol, and underreported his taxable sales of diesel fuel. The federal returns failed to report excise taxes due in the amount of $376,407 for gasoline sales and $200,446 for sales of diesel fuel.

The Texas State Comptroller of Public Accounts audited Powell in 1988, the middle of 1990, and September 1990. The 1988 audit, which covered October 1987 through June 1988, and the first audit in 1990, which covered July 1988 through May 1990, concerned Powell's diesel fuel and gasoline sales. Powell told the auditor

_____

[2] Young had attempted once in late 1988 or early 1989 to export rice and beans and a small bobtail truck to Haiti, but Young failed to pay Haitian officials he was supposed to pay and charged too much for the products he sought to export. The Haitians blew up the truck on the dock, and Young barely escaped, dodging bullets fired from the dock as the ship sailed out of Haiti.

that he was in the business of selling gasoline and diesel fuel, and he stated that he was blending fuel in 1986 and 1987, but he admitted that during the time period of the second audit (July 1988 through May 1990), he was no longer blending fuel. Neither Powell nor his representatives ever said he blended any product with ethanol between July 1988 and May 1990, and Powell never made any claims that he blended fuel during that time period. While there was evidence that Powell had blended fuel in 1988 and in January 1989, there was no evidence of any blending after January 1989.

In the middle of 1990, during the second state audit, the auditor noticed that Powell's sales summaries suddenly started showing sales to DTM. After January 1989, Powell's purported sales to DTM for export began increasing as the months went on. However, neither Powell nor his accountant, Stanley Smith, complied with requests from the auditor that they provide documentation and verification that the sales of fuel were for export. The auditor went to the address listed for DTM in Powell's sales records and found an empty lot with a rundown, vacant building.

In 1990, Powell filed claims for refunds of federal excise taxes. These claims triggered an IRS audit of his Federal Quarterly Excise Tax Returns because Powell sought more in refunds than he had paid. Powell claimed during the audit that he had blended gasoline with ethanol. However, a more thorough review of his records indicated that he had not blended the fuel, but had sold gasoline to his customers. When the auditor questioned Powell about this, Powell created and gave to the auditor a spreadsheet

that purported to show ethanol purchases.  The auditor analyzed the spreadsheet and found it to be false.  Powell also claimed to have exported large quantities of gasoline and diesel fuel to Haiti by ship.  Powell provided the auditor with a stack of invoices, an adding tape machine, and access to his records, in which the auditor found false and fraudulent export documents.  Thereafter, the IRS began a criminal investigation.

During the criminal investigation, Powell gave false and misleading statements to the IRS concerning his blending operation, his source of ethanol, and the price he charged his customers.  He also claimed that he had exported fuel to Haiti by ship and that he rarely received currency as payment for fuel.  Powell's drivers testified that they had never delivered gasoline, gasohol, or diesel fuel to a ship, barge, or tugboat for Powell.  The special agent assigned to the investigation analyzed Powell's records and found that Powell was buying gasoline at the reduced rate, selling it at the full rate of tax, and keeping the difference.  The agent also found that Powell was buying diesel fuel tax-free, selling it with all of the taxes included, and underreporting his taxable sales.  The agent found that the fuel Powell claimed to have exported was actually sold, with all taxes included, to retail stations in the Houston area.  Powell's records contained a spreadsheet on which Powell had, by hand, kept track of the profit he had made in 1989 by not remitting taxes.

On April 26, 1995, Powell was indicted on five counts of attempting to evade and defeat federal excise taxes, in violation

of 26 U.S.C. § 7201, for the four quarters of 1989 and the first quarter of 1990. Trial was set for March 18, 1996.

Six to seven months before trial, Powell ran into his friend Tom Petty, whom Powell had not seen in several years. Powell asked Petty if he had been subpoenaed by the federal government to testify. Powell then repeatedly asked Petty to testify, if he was subpoenaed, that Powell bought all of his ethanol from Petty.

## II.  EVIDENTIARY ISSUES

Powell complains that his conviction must be set aside. He claims that the district court erred by improperly admitting unfairly prejudicial extrinsic evidence of bad acts. We review the district court's decisions to admit evidence for abuse of discretion, and only upon a showing that a party's substantial rights have been affected will we disturb the ruling of the district court. *See First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1574 (5th Cir. 1996).

Powell contests on appeal a number of matters introduced as part of the government's case against him, contending that they constitute evidence of bad acts which is deemed inadmissible by Federal Rule of Evidence 404(b).[3] In particular, Powell objects to

---

[3] Federal Rule of Evidence 404(b) provides:

   **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon

the following matters which were introduced into evidence:

1.  Powell was engaged in an investment scam involving the purchase and resale of tickets to entertainment events.

2.  Powell regularly visited topless bars, and on two occasions he spent over $3,000 per visit, commonly tipping $100 per table dance.

3.  A photograph was taken of Powell, accompanied by two female employees of a topless club, bent over the back of his car, with its trunk open and filled with cash.

4.  Powell made a down payment on a condominium and concealed this information from his wife.

Powell submits that the only purpose of this evidence was to impugn his character and prejudice the jury against him.

While Powell is correct that this evidence would be inadmissible if its only relevance were its tendency to suggest that Powell may have acted in accordance with the bad character that the evidence suggests that Powell may have, Rule 404(b) does not purport to exclude evidence of bad acts if the evidence is "admissible for other purposes." All of this evidence was relevant to the case against Powell.

_____

request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b).

A.   *The Ticket Scam*

Regarding the ticket scam, counsel for the government explained to the district court that the relevance of the testimony on this subject was to explore the potential bias of Tom Petty, who was a testifying witness. During the trial, Powell's strategy was to shift the focus from him to Petty. Powell introduced evidence that Petty had purchased fuel products from refineries with Powell's credit card, and that Powell had not authorized these purchases and was never reimbursed for them.

The government called Petty as a trial witness, and elicited his testimony that Powell had approached Petty prior to trial in an attempt to influence Petty's testimony. Anticipating that Powell might try to impeach Petty as a biased witness, the government also sought to bring out information that would help the jury to understand the history between the two men. Thus, Petty testified that he had lost about $250,000 that he had given to Powell in order to participate in the ticket scam, and that Powell never paid him back.

The potential bias of a witness is always relevant testimony, and it is permitted even on direct examination. *See* **United States v. Fusco**, 748 F.2d 996, 998 (5th Cir. 1984) ("[E]vidence of bias or lack of bias is substantive . . . it may be developed on direct examination, as well as cross-examination, just like any other substantive evidence."). We find no abuse of discretion in the trial court's decision to permit this line of questioning. It is clear that the fact that Petty had lost money in his prior business

-13-

dealings with Powell could have been a ground for the defense to impeach Petty's testimony. The government acted well within its rights when it brought this information out on direct examination in an attempt to ameliorate the effect of an anticipated attempt to impeach Petty on cross-examination.[4]

B. *The Topless Clubs*

With respect to the evidence about Powell spending large sums of money in topless clubs and posing in front of a trunk filled with a large amount of cash, we again find no abuse of discretion. Powell's use of the cash proceeds from the sales of gasoline and diesel was an issue in the case. Powell contended at trial that his evasion of taxes was not willful; rather, it happened by accident or mistake. He presented evidence that Henderson and Petty wrongfully charged gasoline purchases to his credit card, and that Henderson and Bartniski routinely sent large amounts of currency to Young. The implication of this evidence was that Powell had not received any of the money generated by the tax evasion scheme.

_____

[4] The subject of the ticket scheme came up once again during the government's redirect examination of Petty. On cross-examination, Powell had elicited testimony from Petty that Powell at one time had a good reputation in their community. On redirect, the government asked Petty whether there had been any change in Powell's reputation after the ticket scam. Petty responded that Powell's reputation had suffered as a result of the failed venture. Since Powell raised the issue of his own character by asking Petty to testify about Powell's reputation, it was appropriate for the government to inquire about specific instances of conduct. *See* FED. R. EVID. 405(a).

-14-

The government countered this defense by showing, among other things, that Powell's spending habits ran contrary to the defense's portrayal of him as a hapless victim. It was the government's position at trial that one of Powell's motives for committing the crime of fuel excise tax evasion was to support his extravagant lifestyle. Thus, in support of this argument, the government presented a variety of evidence about Powell's free spending, including his generous patronage of topless bars, his ownership of an expensive Cadillac convertible, and his posing for a photograph with two female employees of a topless bar in front of a car trunk filled with the cash collected from fuel purchasers. All of this evidence was probative on the issue of whether Powell was reaping benefits from tax evasion, or if he was, as the defense suggested at trial, of such modest means that he was unable to pay his bills. *See United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir.), *cert. denied*, 116 S. Ct. 54 (1995).

At trial, Powell's counsel objected to the relevance of the testimony about Powell's spending habits at topless bars and the photograph. For the reasons discussed above, we find that this evidence was at least relevant and that the trial court did not abuse its discretion in admitting it. Powell argues on appeal that the evidence was unfairly prejudicial. However, no such objection was registered at trial, and any error that may have occurred was not preserved. Thus, we need not consider whether the evidence should have been excluded because its probative value may have been substantially outweighed by the danger of unfair prejudice against

Powell, *see* FED. R. EVID. 403, or if such error, if any, affected Powell's substantial rights, *see* FED. R. EVID. 103(a).

C.    *The Condominium*

Finally, we consider the evidence of a down payment on a condominium which Powell concealed from his wife.  At trial, Powell consistently denied that he was paid for the fuel that he sold.  The fact of the condominium payment was evidence which supported the government's theory that Powell used the money that he was trying to hide.  Though no evidence was presented that traced the money from the sales of fuel to the purchase of the condominium, the purchase was made during the same time period as the fuel sales, and those sales were the business in which Powell was engaged at the time.  This evidence was thus relevant to the issue of Powell's intent, and was admissible as it was "relevant for other purposes" than those prohibited by Rule 404(b).

Furthermore, there was no error committed in the admission of evidence showing that the down payment on the condominium was concealed from Powell's wife.  The evidence about the condominium payment was elicited from Stanley Smith.  Smith was an accountant who had worked with Powell on various business matters, including the preparation of a personal financial statement used by Powell to maintain a line of credit that he used to purchase fuel.  Included on this personal financial statement was a non-refundable deposit on a condominium in Galveston, Texas, which had been purchased by Galveston Real Estate Investments, Incorporated.  This corporation

had been formed by Smith for Powell because Powell was having marital difficulties and Powell wanted to purchase some property for himself.

During the government's direct examination of Smith on the subject of the condominium purchase, the district judge warned counsel to stay away from the marital-discord aspect of this episode. The government complied with this suggestion. On cross-examination, however, Powell asked Smith if it were common for residents of Houston to own vacation property in Galveston. Smith replied that it was.[5] Then, on redirect, the government immediately returned to the subject of Mrs. Powell's lack of knowledge about the purchase of the condominium. Powell objected on relevance grounds, but not on Rule 403 grounds. Counsel for the government countered that Powell had "opened the door," and the district judge overruled the objection.

The relevancy of the evidence about Mrs. Powell's ignorance of the condominium seems dubious. The government's assertion at trial that Powell "opened the door" is not an adequate explanation of why the evidence should have been admitted.[6] The proper inquiry

_____

[5] Powell also used his cross-examination of Smith to develop the aspect of his defense which sought to shift blame to Powell's in-house accountant, Bryan Reasonover. A major contention of Powell's defense was that mistakes in the payment of fuel excise taxes resulted from Reasonover's incompetence rather than Powell's willful nonpayment of the taxes. Smith testified about his very low opinion of Reasonover's accounting capabilities.

[6] Additionally, in defense of the relevancy of this evidence, the government asserts on appeal that it is probative to show Smith's disposition to help Powell and to cast suspicion on Smith's attack on Reasonover. *See supra* note 5. In light of our above disposition of this issue, it is unnecessary for us to address the

suggested by the government's door-opening argument is whether Powell, during his cross-examination, admitted evidence that turned previously irrelevant evidence into relevant evidence. *See* 21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5039, at 199-200 (1977).

The effect of Powell's questions and Smith's responses on cross-examination was to suggest that the ownership of a condominium is a perfectly innocent arrangement. This evidence on cross-examination was itself irrelevant -- the commonality of vacation home ownership has nothing at all to do with whether Powell had received money from illegal fuel sales -- and it invited further examination on redirect. Though it would have been within the power of the district judge to disallow further testimony on redirect, we will not disturb his decision to permit it. *See generally* JOHN WILLIAM STRONG, ET AL., MCCORMICK ON EVIDENCE § 59 (4th ed. 1992).

## III.  SENTENCING ISSUES

Powell raises a number of issues on appeal regarding the district court's calculation of his sentence. In particular, he claims that the court misapplied the Guidelines in enhancing his sentence under United States Sentencing Guidelines (USSG) §§ 1B1.3 (relevant conduct), 2T1.1(b)(2) (use of sophisticated means of evasion), 3C1.1 (obstruction of justice), and 3B1.1(c) (organizer

---

new arguments raised by the government on appeal.

or leader).[7]  A district court's findings of fact for purposes of applying the Sentencing Guidelines are reviewed under the "clearly erroneous" standard of review.  *See* **United States v. Moore**, 997 F.2d 55, 60 (5th Cir. 1993).  The application of the Guidelines to the facts found by the district court is reviewed de novo.  *See* **id**.

---

[7]  Unless otherwise indicated, all references to the Guidelines are to the 1990 Manual.  The district court and the parties have used the 1990 Manual as the basis for determining Powell's sentence.  Ordinarily, a sentence is determined by reference to the Guidelines Manual in effect on the date of sentencing, *see* USSG § 1.B11(a) (1995), which in this case was August 30, 1996.  However, the Guidelines also provide that when "use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United Sates Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."  *Id*. § 1B1.11(b)(1) (1995).

Our Circuit has determined that a "sentence that is increased pursuant to an amendment to the guidelines effective after the offense was committed violates the *ex post facto* clause."  **United States v. Domino**, 62 F.3d 716, 720 (5th Cir. 1995).  Section 2T4.1 of the Sentencing Guidelines contains the table which sets out increasing base offense levels for progressively larger amounts of tax loss for the purposes of sentencing under the various sections of the Guidelines regarding offenses involving taxation.  That section was amended effective November 1, 1993.  The effect of the amendment was to increase the base offense level applicable to Powell based on the amount of tax loss resulting from his crimes.

We assume, without deciding, that the 1990 Manual is the appropriate reference for sentencing purposes in this case.  We note, however, that the facts suggest that Powell's criminal conduct may have been completed before November 1, 1990, in which case the 1989 Manual would be the appropriate reference.  Because there appear to have been no amendments to the Guidelines between November 1, 1989 and November 1, 1990 that would impact Powell's sentence, we are content to resolve the debate on the parties' terms, which used the 1990 Manual as their point of reference.

A.    *Relevant Conduct*

Under § 2T1.1 of the Guidelines, the base level for Powell's sentence depends upon the total amount of "tax loss," which is defined as "the total amount of tax that the taxpayer evaded or attempted to evade."  USSG § 2T1.1.  The presentence investigation report (PSR) filed in this case based its sentencing recommendation on the total amount of federal taxes which were evaded.  Noting that $915,522.84 in federal taxes had been shown to have been evaded, the PSR recommended a base offense level of 17.  *See* USSG §§ 2T1.1(a), 2T4.1.  The government objected that the amount of state taxes evaded through the same relevant conduct should have also been taken into account.  The addition of the state tax losses raised the total tax loss to $1,798,267.90, which subjected Powell to a base offense level of 18 under USSG § 2T4.1.  At the sentencing hearing the district court sustained the government's objection and sentenced Powell based on the combined total of federal and state taxes evaded.

On appeal Powell complains that for the purposes of the Sentencing Guidelines, the "tax loss" only takes into account the amount of federal taxes that the IRS would have been able to collect (exclusive of interest and penalties).  This is not a substantial argument.

Powell bases his argument on the holdings of **United States v. Daniel**, 956 F.2d 540, 544 (6th Cir. 1992), **United States v. Clements**, 73 F.3d 1330, 1339 (5th Cir. 1996), and **United States v. Moore**, 997 F.2d 55, 61 (5th Cir. 1993), which he cites for the

proposition that the "tax loss" contemplated by USSG § 2T1.1(a) refers only to the amount of tax revenue lost to the IRS, exclusive of any other civil liabilities the IRS may have imposed. Thus, Powell reasons, only the amount of federal tax evaded may be taken into account for the purposes of determining his base offense level under USSG § 2T4.1.

The cases cited by Powell are entirely inapposite. In **Daniel**, the Sixth Circuit held that losses must result from criminal conduct to be considered part of the "tax loss" for the purposes of sentencing under USSG § 2T1.1. *See* **Daniel**, 956 F.2d at 544. The court thus remanded the case for resentencing in light of the district court's inclusion of civil liabilities for unpaid taxes as part of the "tax loss." *See* *id*.

Turning to our Circuit's own precedent, Powell takes too literally our statement in **Clements** that "the 'tax loss' evaded means the tax deficiency assessed . . . rather than the amount that the IRS could actually recover." **Clements**, 73 F.3d at 1339. Our holding in **Clements** spoke only to the conclusion that the computation of "tax loss" looks to the amount of "tax deficiency" and is not limited to the value of an asset hidden for the purposes of evading tax. *See* *id*. at 1338-39. There was no opportunity for us to consider in **Clements** the effect of any state taxes which may have been evaded.

Finally, we noted in **Moore** that "tax loss" contemplates "the amount owed to the government" as a result of the act of tax evasion rather than, as the defendants in that case contended, "the

amount of taxes actually not paid." *See* **Moore**, 997 F.2d at 61. The importance of this distinction in **Moore** was that the defendants had fraudulently induced the IRS to give them tax refunds which the IRS subsequently recovered. *See id*. at 60. We rejected the **Moore** defendants' contention that these facts meant that the amount of "tax loss" for sentencing purposes was zero. *See id*. at 61-62.

None of these cases stand for the proposition suggested by Powell -- that is, that only federal tax losses may be taken into account under USSG § 2T1.1. We reject that suggestion and pursue the analysis mandated by the Sentencing Guidelines. The government asked the district court to include in the USSG § 2T1.1 "tax loss" the state tax losses arising from the same core criminal conduct for which Powell was convicted. Although USSG § 2T1.1 does not speak directly to this situation, it is evident from the text of the Guidelines and their accompanying interpretive commentary that the amount of state taxes evaded may be taken into consideration if they constitute "relevant conduct" as that concept is defined in USSG § 1B1.3.

The Sentencing Guidelines permit many factors to be taken into account in determining a sentence. The concept of "relevant conduct" constitutes one category of these factors. Relevant conduct is taken into account at the outset of the sentencing process, when the base offense level for a convicted defendant's criminal conduct is determined. The Guideline pertaining to relevant conduct provides that in Powell's case, "where the

guideline specifies more than one base offense level,"[8] the base offense level for a sentence "shall be determined on the basis of . . . all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). We note that the relevant conduct considered in selecting the base offense level is not limited to the conduct constituting the underlying criminal offense. *See, e.g.*, **United States v. Vital**, 68 F.3d 114, 118 (5th Cir. 1995). We note also that, as a general proposition, state offenses constituting "relevant conduct" under the Guidelines may be taken into account when imposing a sentence for a federal offense. *See, e.g.,* **United Sates v. Armstead**, 114 F.3d 504, 513 (5th Cir. 1997), *petition for cert. filed*, No. 97-5786 (U.S. Aug. 29, 1997).

Our application of the "relevant conduct" concept is controlled by the commentary supplied by the United States Sentencing Commission, which carries the same weight as legislative rules adopted by federal agencies. *See* **Stinson v. United States**, 508 U.S. 36, 45 (1993). The commentary explains what conduct is contemplated by the USSG § 1B1.3(a)(2) terms "common scheme or plan" and "same course of conduct":

> *(A) Common scheme or plan*. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each

---

[8] The applicability of USSG § 1B1.3(a)(2) is determined by reference to USSG § 3D1.2. Because the offense level specified by USSG § 2T1.1 "is determined largely on the basis of the total amount of harm or loss," the grouping rule of the Sentencing Guidelines provides that "[a]ll counts involving substantially the same harm shall be grouped together," USSG § 3D1.2, and thus USSG § 1B1.3(a)(2) is the applicable relevant conduct provision.

other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.  . . .

*(B)  Same course of conduct*.  Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.  . . .

USSG § 1B1.3 comment. n.9 (1995).

As an initial matter, we observe that the commentary describing "common scheme or plan" and "same course of conduct" requires in both prongs that the potentially relevant conduct constitute an "offense."  *See* **id**.  Although the Guidelines themselves do not specify what constitutes an "offense,"[9] we are guided in this matter by our Circuit's precedent.  "For conduct to be considered 'relevant conduct' for the purpose of establishing ones offense level that conduct must be criminal." **United States v. Peterson**, 101 F.3d 375, 385 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1346 (1997).

The trial court found that the additional loss sustained by the State of Texas during the same period of time and arising from the same offense conduct was a criminal tax loss.  Powell has argued on appeal that there is no evidence in the record to support this conclusion.  While we agree that the record below on this

---

[9]  There is, of course, a definition of "offense" in the Guidelines.  *See* USSG § 1B1.1 comment. n.1(*l*).  However, because that definition of "offense" includes within its text the term "relevant conduct," as a matter of logic that definition is not helpful to our inquiry as to the parameters of "relevant conduct."

issue is sparse,[10] we conclude that the district court's conclusion on this point was not clearly erroneous. *See* TEX. TAX CODE ANN. § 153.403 (Vernon 1992 & Supp. 1997) (providing state criminal liability for various methods of evading state fuel excise taxes).

We turn now to the issue of whether the evasion of state taxes may be considered to be related to the conduct constituting the underlying offense as part of a "common scheme or plan" or the "same course of conduct." Powell's evasion of state and federal taxes involved the same *modus operandi*: using a tax certificate to buy fuel at a reduced rate, filing false tax returns, using false customer invoices, and supplying false information to taxing

---

[10] The government did not explicitly state a theory of how Powell's evasion of state taxes constituted criminal conduct. The government's objection to the PSR conceded that criminal activity is confined to conduct constituting a criminal offense under federal, state, local, or foreign law, and while the government demonstrated that Powell violated state laws, the government did not demonstrate that Powell committed criminal conduct under those laws.

During the sentencing hearing the district court inquired into this matter. With respect to the government's objection the district court stated:

> The objection is that as a part of relevant conduct for this same period of time in these same quarters in the same offense conduct, there was also a loss to the State of Texas, a tax loss, a criminal tax loss -- is that the position?

The government then responded "yes." The court then proceeded, stating:

> I find from a preponderance of the evidence that that's correct; that should be considered relevant conduct within the meaning of the Guidelines.

Neither the parties nor the court identified any statute making the defendant's state tax evasion criminal conduct. As noted above, however, we find no error.

authorities.  This suggests the presence of a common scheme or plan.

The commentary to the Guidelines specifies three factors to be taken into consideration in finding a common scheme or plan: temporal proximity, similarity, and regularity.  *See* USSG § 1B1.3 comment. n.9 (1995).  The district court found that Powell's conduct with respect to state and federal tax evasion took place during the same period of time, which satisfies the temporal proximity requirement.  The court also found that the two offenses were based on the same conduct, which satisfies the similarity requirement.  With respect to regularity, although the district court made no specific finding, it is clear from the record that Powell's conduct was not made up of isolated and sporadic incidents.  Rather, his criminal conduct can be aptly described as consistently repeated behavior.

We review the district court's determination of the amount of loss, as well as its findings as to what constitutes relevant conduct, for clear error.  *See* **Peterson**, 101 F.3d at 384.  As discussed above, the facts of Powell's conduct make clear that the district court did not clearly err in deciding that the state tax evasion was part of Powell's relevant conduct.  It was therefore proper for the district court, in calculating Powell's sentence, to include the amount of state fuel excise taxes evaded in the total "tax loss" used to determine Powell's base offense level.

B.   *Sophisticated Means*

The district court added two levels to Powell's sentence under USSG § 2T1.1(b)(2).  The Guidelines provide that "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense, increase by 2 levels."  USSG § 2T1.1(b)(2).  The commentary to § 2T1.1 observes: "'Sophisticated means,' as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case.  An enhancement would be applied, for example, where the defendant used offshore bank accounts or transactions through corporate shells or fictitious entities."  USSG § 2T1.1 comment. n.4. (1995).  In accepting the PSR's recommendation of applying the two-point increase for sophisticated means, the district judge noted that Powell's scheme was more complex and intricate than routine tax evasion, and that the evidence demonstrated that Powell's mode of operation was similar to the examples cited in the commentary to the Guidelines.  The district court's factual determination that Powell used sophisticated means is reviewed for clear error.  *See* **Clements**, 73 F.3d at 1340.

Powell objects that he could not be found to have used sophisticated means because all the government contends is that (1) he obtained a form which enabled him to buy fuel at a decreased rate of tax because he was blending ethanol with the gasoline, (2) after he stopped blending gasoline he continued to buy fuel at the low tax rate, and (3) he thereafter filed excise tax returns which claimed no tax was due.  Thus, Powell concludes in his brief,

-27-

"assuming *arguendo* the government's theory, the making of such false statements on tax returns does not constitute the use of sophisticated means."

We disagree with Powell's characterization of the issue. This was much more than a case of misrepresentations on a tax return, which would probably not justify invocation of the sophisticated means provision. *See **United States v. Rice***, 52 F.3d 843, 849 (10th Cir. 1995), *cert. denied*, 116 S. Ct. 2536 (1996). Rather, the facts show that Powell purchased an ethanol plant to facilitate his scheme to defraud the government by avoiding excise taxes. This course of action constitutes the sort of "greater intricacy or planning" contemplated by the Sentencing Guidelines. The district court thus committed no error in increasing Powell's offense level based on its finding that Powell used sophisticated means.

C.    *Obstruction of Justice*

The district court increased Powell's offense level by two levels based on his obstruction of justice. Section 3C1.1 of the Guidelines provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.". USSG § 3C1.1. The PSR recommended the increase, based upon the following actions by Powell: (1) making false statements to an IRS auditor, (2) submitting false documents during an IRS audit, (3) making false statements to an IRS agent investigating Powell's

blending operation, (4) attempting to conceal his scheme by falsely claiming to have purchased ethanol from certain suppliers, and (5) attempting to suborn perjury by asking Tom Petty to testify falsely at Powell's trial. The district court accepted this recommendation over Powell's objection.

On appeal, Powell contends that an obstruction-of-justice increase cannot be based merely upon a false statement made to an investigator unless the statement significantly obstructed an official investigation or prosecution of the offense. Powell also argues that when the government is already in possession of accurate information, a false statement by the defendant is not a material falsehood. In essence, Powell's argument is that any obstruction that he may have created was not substantial.

The district court's factual finding of an obstruction of justice is subject to review for clear error. *See* **United States v. Tello**, 9 F.3d 1119, 1122 (5th Cir. 1993). We could reverse the finding of the district court only if we held a "definite and firm conviction that a mistake has been committed." **United States v. United States Gypsum Co.**, 333 U.S. 364, 395 (1948). Under this standard, we cannot say that the judgment of the district court was clearly erroneous. Evidence in the case showed that Powell made false statements to investigating IRS agents and that he attempted to influence the testimony of a witness. This is the type of behavior that subjects a defendant to the obstruction-of-justice enhancement under the Guidelines. *See generally* USSG § 3C1.1

comment. n.3 (1995).  Under these circumstances, the judgment of the district court cannot be disturbed.

D.    *Organizer or Leader*

Finally, Powell disputes the application of USSG § 3B1.1(c) to enhance his sentence based upon his aggravating role as an "organizer, leader, manager, or supervisor."  This argument is based wholly upon Powell's contention that he did not have a supervisory role.  We review the district court's factual findings for clear error.  **United States v. Upton**, 91 F.3d 677, 688 (5th Cir. 1996), *cert. denied,* 117 S. Ct. 1818 (1997).  Despite the PSR's recommendation of a four-level enhancement under USSG § 3B1.1(a) (which requires criminal activity involving five or more participants), the district court was unable to find that a preponderance of the evidence would support the conclusion that Powell's organization of people was large enough to meet the requirements of that provision.  The judge did find, however, that a preponderance of the evidence supported an increase under USSG § 3B1.1(c).  The record plainly shows that Powell supervised Reasonover's work on fraudulent tax returns.  This factor alone is sufficient to support the district court's judgment.  We thus find no clear error.

IV.

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

-30-