Revised May 18, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40420
_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

        v.

JAMES ANDERSON and DEAN HODGE,

                              Defendants-Appellants.

_____

          Appeals from the United States District Court
                for the Eastern District of Texas
_____
                        April 26, 1999
Before KING, Chief Judge, STEWART, Circuit Judge, and LITTLE,
Chief District Judge.[*]

KING, Chief Judge:

     Defendants-appellants James Anderson and Dean Hodge appeal

their convictions and sentences for conspiracy, transporting and

selling stolen goods in interstate commerce, and bank fraud.  For

the following reasons, we affirm Hodge's conviction and sentence,

and Anderson's conviction.  We vacate Anderson's sentence and

remand for resentencing.

                I.  FACTUAL AND PROCEDURAL BACKGROUND

_____

     [*]  Chief Judge F. A. Little, Jr., of the Western District of
Louisiana, sitting by designation.

On July 9, 1997, a federal grand jury for the Eastern District of Texas returned a seven-count indictment against defendants-appellants James Anderson and Dean Hodge (collectively, defendants) and co-defendant Christopher Garner. Defendants and Garner were arraigned and entered not guilty pleas.

On September 10, 1997, the same grand jury returned a seven-count superseding indictment against defendants and Garner. Defendants and Garner were all named in counts one through three. Count one charged a violation of 18 U.S.C. § 371, conspiracy to transport and sell stolen goods in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2315. Count two charged violations of 18 U.S.C. §§ 2314 and 2, transportation and aiding and abetting the transportation of stolen goods in interstate commerce. Count three charged violations of 18 U.S.C. §§ 2315 and 2, sale and aiding and abetting the sale of stolen goods in interstate commerce. Counts four through seven charged Hodge with bank fraud in violation of 18 U.S.C. § 1344. Defendants were arraigned and entered not guilty pleas. Garner entered into a plea agreement with the government and testified against defendants at trial.

A jury trial began on December 10, 1997. According to the evidence presented at trial, during the period between February 1, 1996 and March 27, 1996, defendants illegally harvested timber from four Louisiana properties owned respectively by Willamette

Industries (Willamette), Discus Oil Corporation (Discus) and WLS Corporation (WLS), W.E. Barron, Jr., and Elmer Davies. Pursuant to the scheme, Garner reviewed county or parish tax records in order to obtain the names and addresses of individuals who owned tracts of land with timber. He then sent out a bulk mailing to these individuals in which he offered to provide forest management and timber services. He specifically sought out landowners whose property was adjacent to land owned by non-resident owners. In several instances, Garner entered into a contract with landowners who had responded to his mailing and then assigned the contract to Anderson for a percentage of the profits. Anderson in turn hired Hodge to harvest the timber. However, in addition to, or instead of, harvesting the timber on the land that was the subject of the contract, Hodge and/or his crew harvested the timber on adjoining land owned by non-residents. Defendants transported a portion of the harvested timber from Louisiana to mills in Texas and sold the timber.

More specifically, in February 1996, Garner contracted to harvest timber on land owned by Kelley Barnes. On February 23, 1996, Garner assigned the contract to Anderson. On February 25, 1996, Anderson hired Hodge to harvest the timber. From February 25, 1996 until March 8, 1996, Hodge's crew actually harvested timber on land located north of the Barnes tract that was owned by Willamette, and then transported that timber from the Willamette tract to the Arkansas Forest Products mill located in

3

Shelby County, Texas, where it was sold.  Willamette suffered losses amounting to $57,582.12.

In March 1996, Garner contracted to harvest timber from land owned by Roosevelt Boler.  On March 13, 1996, Garner assigned the Boler contract to Anderson, who then hired Hodge to harvest the Boler timber.  Anderson paid Boler, but never cut his timber.  On March 13, 1996, Anderson, Hodge, and crew actually harvested timber on a tract of land adjacent to the Boler tract owned by Discus and WLS.  Discus and WLS suffered losses amounting to $38,532.53.

On March 20, 1996, Garner contracted to harvest timber from land owned by the Molly Peoples estate.  On March 20, 1996, Garner assigned the contract to Anderson.  On March 26, 1996, Anderson hired Hodge to harvest the timber.  On March 27, 1996, Hodge's crew actually harvested timber on two neighboring tracts of land owned by Barron and Davies respectively.  Barron suffered losses amounting to $3833.38 and Davies suffered losses amounting to $1461.20.

With respect to the bank fraud counts alleged in the indictment, the evidence at trial established that on July 24, 1995, Hodge entered into a loan agreement with the First National Bank of Hughes Springs (First National).  As part of the agreement, Hodge assigned his company's (Circle H Timber's) interest in two timber deeds to First National as collateral for a loan.  Thereafter, on January 29, 1996, Hodge executed a

4

renewal of this loan in the amount of $26,092. Hodge falsely represented to First National that he would repay the loan from proceeds of the sale of timber from the collateral property when, in fact, Hodge knew that prior to the execution of the loan renewal he had harvested and sold the timber in question.

Similarly, on September 7, 1995, Hodge assigned Circle H Timber's interest in another timber deed to First National as collateral for a second loan. On March 25, 1996, Hodge renewed this loan in the amount of $41,067, and again falsely informed First National that he would repay the loan from the proceeds of the sale of timber from the aforementioned property, but had already harvested and sold the timber without giving any of the proceeds to First National.

As collateral for a third loan, Hodge assigned his interest in another timber deed on September 25, 1995. On March 25, 1996, Hodge renewed this loan in the amount of $15,554 by falsely representing to First National that this loan would be repaid from the proceeds of the sale of timber taken from the property. At the time Hodge renewed the loan, he knew that he had already harvested and sold all the timber from the property and had provided none of the proceeds to First National.

Finally, on November 14, 1995, Hodge assigned Circle H Timber's interest in a timber deed from another property to First National as collateral for a fourth loan. On March 25, 1996, Hodge renewed this loan in the amount of $8854 by falsely

5

representing to First National that he would repay the loan with the proceeds of the sale of timber taken from the property. In fact, Hodge had already harvested and sold the timber from the property and had not provided the proceeds to First National.

The combined value of the four fraudulently renewed loans was $91,567. First National auctioned other collateral substituted by Hodge worth $49,257.42, and applied that amount to Hodge's four outstanding loans. Thereafter, a balance of $42,309.58 remained.

At the close of the government's case, defendants moved for judgments of acquittal. The court denied the motions. At the close of all evidence, defendants renewed their motions for judgments of acquittal. The district court again denied the motions. On December 15, 1997, the jury found defendants guilty on all counts with which they were charged.

Anderson appeared for sentencing on March 20, 1998. Anderson's presentence report (PSR) had added eleven levels to his initial base offense level of four pursuant to United States Sentencing Guideline (U.S.S.G.) § 2B1.1(b)(1)(L) because the loss Anderson had caused was more than $350,000, and two levels pursuant to U.S.S.G. § 2B1.1(b)(4) because the offense involved more than minimal planning. Based on a final base offense level of seventeen and a criminal history category of II, the sentencing guidelines suggested a range of twenty-seven to thirty-three months of imprisonment. Anderson received a

6

sentence of twenty-seven months of imprisonment to be followed by three years of supervised release.  The district court also ordered Anderson to pay restitution in the amount of $354,905.30 and a $50 special assessment for each count of conviction.  Anderson timely appealed, and the district court granted Anderson's motion for release pending appeal.

Hodge appeared for sentencing on March 26, 1998.  His PSR calculated his base offense level with regard to counts one through three by adding ten levels to the initial base level of four pursuant to U.S.S.G. § 2B1.1(b)(1)(K) because the loss caused by Hodge was more than $200,000 but less than $350,000, and by adding two levels pursuant to U.S.S.G. § 2B1.1(b)(4) because the offense involved more than minimal planning.  The PSR's calculations further increased Hodge's base offense level by four levels pursuant to U.S.S.G. § 3B1.1(a) for his role as an organizer or leader, resulting in an adjusted base offense level of twenty.  With regard to counts four through seven, the PSR calculated Hodge's base offense level by increasing the initial base level of six by six levels because the loss was more than $70,000 but less than $120,000, and by increasing that total by two levels for more than minimal planning, resulting in a total adjusted offense level of fourteen.  Pursuant to U.S.S.G. § 3D1.4, the multiple-count adjustment, Hodge's combined adjusted base offense level was twenty-one.  Based on this base offense level and a criminal history category of I, the guidelines

7

suggested a range of thirty-seven to forty-six months of imprisonment.  Hodge received a sentence of thirty-seven months of imprisonment to be followed by five years of supervised release.  The district court ordered Hodge to pay restitution in the amount of $245,711.90 and a $50 special assessment for each count of conviction.  Hodge timely appealed, and the district court granted his motion for a stay of imprisonment pending appeal.

On appeal, Anderson argues that the evidence was insufficient to support his conviction on counts one through three.  He also contends that the district court erred by considering conduct other than the conduct charged in the indictment for purposes of calculating Anderson's base offense level at sentencing.  The PSR used losses stemming from this other conduct to increase Anderson's base offense level.  Finally, Anderson argues that the district court erred by failing to enter any findings as to the contested issues of fact that Anderson raised in his objections to the PSR.

Hodge similarly argues that the evidence was insufficient to support his conviction on counts one through seven of the indictment.  He further argues that the district court erred by failing to read the superseding indictment to the jury.  He also challenges his sentence, contending that he is entitled to a downward adjustment for acceptance of responsibility, that the loss attributable to him under the bank fraud counts should be

8

the actual, rather than the intended, loss to First National, that he is entitled to a reduction for minor participant status, and that evidence of other conduct should not have been considered at sentencing for purposes of calculating his base offense level.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

Both Anderson and Hodge argue that the evidence failed to establish that they participated in a conspiracy as charged in count one of the superseding indictment, or that they aided and abetted in the commission of the substantive offenses of transportation and sale of stolen goods in interstate commerce as charged in counts two and three.  Hodge additionally argues that the evidence failed to demonstrate that he committed the offense of bank fraud as charged in counts four through seven of the superseding indictment.

Both defendants moved for acquittal at the close of the government's case and at the close of evidence.  We review the district court's denial of defendants' motions for acquittal de novo, applying the same standards as the district court in reviewing the sufficiency of the evidence.  See United States v. Payne, 99 F.3d 1273, 1278 (5th Cir. 1996).  In determining whether there was sufficient evidence to sustain defendants' convictions, we must decide, viewing the evidence and the

9

inferences therefrom in the light most favorable to the verdict, whether a rational juror could have found defendants guilty beyond a reasonable doubt.  See United States v. Burton, 126 F.3d 666, 669 (5th Cir. 1997); Payne, 99 F.3d at 1278.  "'The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.'"  Burton, 126 F.3d at 669-70 (quoting United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994)); see United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd, 462 U.S. 356 (1983).  Moreover, our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct.  See Burton, 126 F.3d at 670; United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir.1993); Bell, 678 F.2d at 549 n.3.

To establish a conspiracy to transport and sell stolen goods in interstate commerce, the government was required to prove (1) an agreement between two or more persons, (2) to commit the crimes, and (3) an overt act committed by one of the conspirators in furtherance of the agreement.  See Burton, 126 F.3d at 670.  Moreover, there must be proof beyond a reasonable doubt that "the defendant[s] knew about the conspiracy and . . . voluntarily became part of it."  United States v. Krenning, 93 F.3d 1257, 1264 (5th Cir. 1996) (internal quotation marks omitted).

10

To convict defendants of the transportation of stolen goods in violation of 18 U.S.C. § 2314, the government was required to show that defendants transported stolen goods in interstate commerce, that defendants knew the goods were stolen, and that the goods were worth more than $5000. See United States v. Mackay, 33 F.3d 489, 493 (5th Cir. 1994). To convict defendants of the sale of stolen goods in violation of 18 U.S.C. § 2315, the government was required to show that defendants sold stolen goods, that the goods were worth more than $5000 and had crossed state lines after being stolen, and that defendants knew the goods were stolen. See 18 U.S.C. § 2315. Because defendants were charged with aiding and abetting the substantive offenses, it was not necessary to prove that each defendant completed each specific act charged in the indictment. See United States v. Ismoila, 100 F.3d 380, 387 (5th Cir. 1996). The government must prove, however, that the defendants shared the criminal intent required for the substantive offenses. See id. Aiding and abetting means simply that the defendants assisted a criminal venture while sharing the requisite criminal intent, and took some affirmative action to make the venture succeed. See id.; United States v. Martiarena, 955 F.2d 363, 366 (5th Cir. 1992). Mere presence and association are insufficient to sustain a conviction for aiding and abetting. See Martiarena, 955 F.2d at 366.

11

Anderson argues that the evidence against him was tenuous and could not have supported the jury's verdict. He contends that no evidence established an agreement between him and Garner and Hodge to commit a crime. He argues that, in the case of the Discus and WLS property, he paid Boler for the timber he had contracted to cut, indicating at best that a mistake as to boundaries had occurred. Similarly, Hodge argues that there was no evidence showing that he was part of a conspiracy and that he was merely harvesting timber pursuant to the instructions of Anderson and Garner.

After reviewing the evidence in the light most favorable to the verdict, we conclude that it was sufficient to sustain Anderson's and Hodge's convictions on counts one through three. The jury could have reasonably inferred from the evidence presented that Garner and defendants entered into an agreement to cut timber from Louisiana property without obtaining the permission of the owners and then transport that stolen timber to out-of-state mills to be sold. The jury was free to disbelieve Anderson's theory that a mistake as to boundaries had occurred and free to believe Garner's testimony that he and Anderson had an understanding that timber on land adjacent to the land that was the subject of their contracts would be cut. From this, the jury was free to infer the existence of a conspiracy. The jury was also free to infer Hodge's participation in the conspiracy from Garner's testimony. Garner testified that he once informed

12

Hodge that Hodge was cutting on the wrong property, but Hodge told Garner not to worry about it.  Garner also testified that Hodge informed Garner that he had left some timber uncut along a particular road in order to hide the fact that timber had been cut on the wrong property.  Similarly, there was testimony that Hodge's crew continued to harvest timber on the Willamette property for six weeks after being informed that they were on the wrong tract.  Thus, there is sufficient evidence to sustain Anderson's and Hodge's convictions on counts one through three.

As to counts four through seven, Hodge maintains that the evidence cannot support his conviction because he did not obtain monetary funds from First National at the time of his loan renewals, and because he later executed a substitution of collateral agreement with the bank in lieu of the timber initially pledged as collateral.

Bank fraud under 18 U.S.C. § 1344 involves, <u>inter</u> <u>alia</u>, the knowing execution of a scheme or artifice to defraud a financial institution.  <u>See</u> <u>United States v. Campbell</u>, 64 F.3d 967, 975 (5th Cir. 1995).  A scheme to defraud includes "the use of fraudulent pretenses or representations intended to deceive to obtain something of value from a financial institution."  <u>Id.</u> Additionally, the defendant must have knowingly made a misrepresentation to the bank.[1]  <u>See</u> <u>id.</u>

_____

[1]  In <u>United States v. Dupre</u>, 117 F.3d 810, 815-16 (5th Cir. 1997), we declined to determine whether materiality is still an

13

After reviewing the evidence in the light most favorable to the jury's verdict, we conclude that there is sufficient evidence to sustain Hodge's conviction on counts four through seven. Testimony established that at the time of each loan renewal Hodge informed his loan officer that the timber serving as collateral had not been cut, when in fact it had been cut, and that the loan officer thereafter renewed the loan. The evidence is therefore sufficient to establish that Hodge knowingly made a misrepresentation that influenced the bank's decision with the intention of obtaining something of value from the bank--the use of the bank's money for longer than Hodge would have otherwise been entitled to it. Cf. United States v. Dobbs, 63 F.3d 391, 395-96 (5th Cir. 1995) (finding evidence sufficient to sustain bank fraud conviction where defendant sold collateral but did not use proceeds to pay off loan, constituting a diversion of funds belonging to the bank and establishing defendant's intent to defraud). That Hodge later substituted new collateral once he was confronted with the missing collateral is irrelevant because the crime was already completed.

## B. Failure to Read Superseding Indictment to Jury

Hodge contends that the district court erred by failing to require the reading of the superseding indictment to the jury.

element of 18 U.S.C. § 1344 in light of the Supreme Court's decision in United States v. Wells, 117 S. Ct. 921 (1997), which held that materiality is not an element of 18 U.S.C. § 1014. We need not decide that issue today, and decline to do so.

14

Hodge did not object to the failure to read the indictment at trial. Thus, we review for plain error. See United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc). Under Federal Rule of Criminal Procedure 52(b), this court may correct forfeited errors only where the appellant demonstrates (1) that there is an error, (2) that the error is plain, and (3) that the error affects the appellant's substantial rights. See United States v. Olano, 507 U.S. 725, 732-35 (1993). Even if these factors are met, this court will correct a forfeited error only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 736 (internal quotation marks omitted) (alteration in original).

Although the district court did not read the indictment to the jury, the government had summarized the charges during voir dire and explained the charges during its opening statement. More importantly, the district court instructed the jury on each element of the offenses charged, provided a copy of the indictment to the jury at the conclusion of the trial for use in their deliberations, and admonished the jury that the indictment itself has no evidentiary value. Previously, we have held that it is not error for a district court to fail to read the entire indictment to the jury, but instead to instruct the jury to read part of it themselves, where the district court had instructed the jury that the indictment is not evidence. See United States v. Sutherland, 656 F.2d 1181, 1202 (5th Cir. Unit A Sept. 1981);

15

<u>United States v. Jones</u>, 587 F.2d 802, 805-06 (5th Cir. 1979).

Additionally, courts have upheld the reading of summaries of the indictment.  See <u>United States v. Rodriguez-Alvarado</u>, 952 F.2d 586, 590 (1st Cir. 1991) ("The purpose of reading the indictment is to inform the jury fairly of the charges against the defendant. . . . There is no requirement that such information be given by reading the whole, or even part, of the indictment.") (citation omitted).  We conclude that the district court did not plainly err by failing to read the superseding indictment to the jury.

## C.  Sentencing

Hodge and Anderson each challenge their sentences on several grounds.  We review the district court's findings of fact at sentencing for clear error, and its application of the sentencing guidelines de novo.  See <u>United States v. West</u>, 58 F.3d 133, 137 (5th Cir. 1995).

Hodge contends that the district court erred by failing to sustain his objection to his PSR's use of the value of the renewed loans, rather than the actual amount of the loss suffered by First National, to calculate Hodge's base offense level for his bank fraud offenses.  The four loans Hodge fraudulently renewed totaled $92,369.  Because the bank later sold collateral substituted by Hodge, the actual loss to the bank was only $42,309.58.  Hodge's argument lacks merit.  Application note 7(b)

16

to U.S.S.G. § 2F1.1 provides that, in fraudulent loan application cases, the intended loss should be used to calculate the base offense level where it is greater than the actual loss. See U.S. SENTENCING GUIDELINES MANUAL § 2F1.1 application note 7(b) (1997). Moreover, because of the grouping provisions of U.S.S.G. § 3D1.4, Hodge's total base offense level would not change even had the district court sustained his objection. Thus, the district court did not err in adopting the intended loss in calculating Hodge's base offense level.

Hodge next contends that he was entitled to a two-level decrease in his base offense level for acceptance of responsibility because of the substitution of collateral agreement he executed. The PSR recommended no adjustment for acceptance of responsibility because Hodge denied his guilt and put the government to its burden of proof at trial. Hodge objected to this determination, admitting that he denied his guilt, but contending that because he voluntarily cooperated with First National in the sale of the substitute collateral he was entitled to a § 3E1.1 adjustment. U.S.S.G. § 3E1.1 provides for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S. SENTENCING GUIDELINES MANUAL § 3E1.1(a). Whether a defendant is entitled to a downward adjustment for acceptance of responsibility is thus a factual determination. We will affirm a sentencing court's decision not to award a reduction under U.S.S.G. § 3E1.1 unless

17

it is "without foundation," a standard of review more deferential than the clearly erroneous standard.  <u>United States v. Hooten</u>, 933 F.2d 293, 297-98 (5th Cir. 1991) (internal quotation marks omitted); <u>see</u> <u>United States v. Kinder</u>, 946 F.2d 362, 367 (5th Cir. 1991).  The district court's conclusion that Hodge had not accepted responsibility for his actions does not lack foundation.  Although Hodge did agree to substitute collateral, he waited until after the bank discovered his disposal of the original collateral.  Moreover, he denied his guilt and forced the government to prove its case at trial.  We conclude that the district court did not err by refusing to award Hodge a two-level reduction for acceptance of responsibility.

Hodge next contends that the district court should have awarded him a downward adjustment based on his minor role in the timber theft conspiracy.  Hodge claims that Anderson and Garner received virtually all of the profits from the scheme, while he received only a small fee based on the tonnage of logs hauled.  A minor participant is defined as "any participant who is less culpable than most other participants, but whose role could not be described as minimal."  U.S. SENTENCING GUIDELINES MANUAL § 3B1.2 application note 3.  The PSR did not recommend a downward departure pursuant to U.S.S.G. § 3B1.2, and Hodge made no objection to this omission.  Instead, the PSR recommended, and the district court awarded, a four-level increase pursuant to U.S.S.G. § 3B1.1(a) because Hodge was the organizer or leader of

18

a criminal activity involving five or more participants.[2]  Hodge
did object to this increase, but does not challenge it on appeal.
Because Hodge failed to raise before the district court his
argument for a two-level decrease for minor participant status,
our review is for plain error.  See Calverley, 37 F.3d at 162-64.
We conclude that it was not plain error for the district court to
fail to decrease Hodge's base offense level for minor participant
status in light of the fact that it awarded a four-level increase
for organizer or leader status pursuant to U.S.S.G. § 3B1.1(a).
See United States v. Thomas, 932 F.2d 1085, 1092 (5th Cir. 1991)
("It is improper for a court to award a minor participation
adjustment simply because a defendant does less than the other
participants.  Rather, the defendant must do enough less so that
he at best was peripheral to the advancement of the illicit
activity.").

Finally, both Hodge and Anderson argue that the district
court erred in calculating the amount of loss attributable to
them, and thus their base offense levels, because the district
court included conduct not charged in the superseding indictment
as relevant conduct pursuant to U.S.S.G. § 1B1.3.  They argue
that this conduct lacked a sufficient relationship to the other
conduct attributed to them for sentencing purposes.  Both
defendants objected to their PSR's inclusion of these incidents

---

[2]  The PSR included this adjustment because Hodge directed
his crew to cut timber that they were not authorized to cut.

as relevant conduct.  The district court overruled their objections and adopted the findings of the PSR.[3]  A district court's calculation of the amount of loss attributable to a defendant at sentencing and its determination of what constitutes relevant conduct are reviewed for clear error.  See United States v. Peterson, 101 F.3d 375, 384 (5th Cir. 1996).

The guidelines define "relevant conduct," for offenses (such as the instant offenses) for which U.S.S.G. § 3D1.2(d) would require grouping of multiple counts, to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(2).  It is not necessary for the defendant to have been charged with or convicted of carrying out the other acts before they can be considered relevant conduct.  See United States v. Thomas, 969 F.2d 352, 355 (7th Cir. 1992); United States v. Moore, 927 F.2d 825, 827 (5th Cir. 1991).  However, for the acts to constitute relevant conduct, the conduct must be criminal.  See United States v. Powell, 124 F.3d 655, 665 (5th Cir. 1997); Peterson, 101 F.3d at 385.  Two or more offenses form part of a "common scheme or plan" where they are

---

[3]  Anderson also challenges the district court's failure to make specific factual findings.  The district court implicitly adopted the findings contained in the PSR and overruled Anderson's objections thereto, and thus did not need to reiterate its specific factual findings.  See United States v. Gaytan, 74 F.3d 545, 557 (5th Cir. 1996); United States v. Carreon, 11 F.3d 1225, 1230-31 (5th Cir. 1994); United States v. Mora, 994 F.2d 1129, 1141 (5th Cir. 1993).

20

"substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 application note 9(A).  "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  Id. § 1B1.3 application note 9(B). Relevant factors to consider in making this determination include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."  Id.; see United States v. Bethley, 973 F.2d 396, 401 (5th Cir. 1992) ("To qualify as relevant conduct, the prior conduct must pass the test of similarity, regularity and temporal proximity.").

Hodge's PSR included as relevant conduct the following four incidents:

In 1990, Hodge met Hazel Jones, an absentee landowner, who informed him that she owned property in East Texas and was interested in having her timber cut.  Hodge replied that he would have a forester look over her property.  Jones later met Hodge and showed him the property.  She then returned to California where she waited to hear from Hodge.  She never heard from Hodge and never entered into a timber contract with him.  At a later

21

date, a family member of Jones discovered that Hodge's timber crew was removing timber from Jones's property. Hodge removed approximately twenty-four acres of trees valued at approximately $4100. Jones received no compensation from Hodge for the timber he removed.

On October 14, 1993, Roger Niemann advised the sheriff's office that timber was being illegally removed from his property. Hodge had entered into a timber contract with Harriet Ross, who owned property adjacent to Niemann's. At some point prior to October 14, 1993, Hodge had begun removing timber from the Niemann property. While removing the Niemann timber, sheriff's deputies confronted Hodge and told him to cease operations. Once the deputies left, however, Hodge continued to harvest Niemann's timber, which was later transported to mills in Louisiana, Arkansas, and Texas. The value of the Niemann timber totaled approximately $42,138.77.

In 1990, Diane Sweet gave Hodge permission to cross her land in order to get to an adjacent tract of land his crew was cutting. She later observed that Hodge had damaged her property and had taken 100 trees off her land. In 1994 and 1995, she again found Hodge removing timber from her property. At no time did Sweet have a contract with Hodge for the removal of timber. Hodge has never compensated Sweet for the illegal removal of her timber, the value of which was $25,000.

22

In May 1995, Charles Swift received a call from a friend who asked him if he had sold some of his timber in Harrison County, Texas. Swift responded that he had not. He then contacted local authorities who went to Swift's land. Upon arriving, officers observed equipment belonging to Hodge's company, Circle H Timber. Between May 15, 1995 and May 17, 1995, Hodge had illegally harvested and transported at least 708 tons of timber to six mills located in Texas and Louisiana. The value of the timber totaled approximately $32,878.

The PSR calculated the loss amount attributable to Hodge by adding the loss that directly resulted from the offense of conviction ($103,797.33) to the loss that resulted from the above four incidents ($104,116.77), for a total combined loss of $207,914.10. This amount resulted in an increase to Hodge's base offense level of ten levels pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

Hodge argues that there was an insufficient temporal and locational relationship between the incidents described above and the conduct charged in the superseding indictment. The district court adopted the reasoning of the PSR, which concluded that all the conduct attributable to Hodge formed part of a common scheme or plan because there existed a common purpose and similar modus operandi. See U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 application note 9(A). The common purpose was the illegal removal and sale of timber that did not belong to Hodge. The similar modus

23

<u>operandi</u> involved removing timber from land belonging to absentee landowners who would be less likely to discover the removal, and removing timber from land adjacent to land containing timber that Hodge had permission to harvest.  Although the incidents occurred over a period of several years, there is "no separate statute of limitations beyond which relevant conduct suddenly becomes irrelevant."  <u>Moore</u>, 927 F.2d at 828.  Moreover, the incidents occurred regularly over this period, with the last one occurring a mere nine months before the events alleged in the superseding indictment.  There is "sufficient similarity and temporal proximity to reasonably suggest that repeated instances of criminal behavior constitute a pattern of criminal conduct." <u>Bethley</u>, 973 F.2d at 401 (internal quotation marks omitted).  We conclude that the district court did not clearly err in finding that the above incidents were sufficiently connected to the offense conduct to constitute relevant conduct for purposes of § 1B1.3(a)(2).[4]

---

[4] Hodge relies on <u>United States v. Madkins</u>, 14 F.3d 277, 279 (5th Cir. 1994), for the proposition that "conduct occurring before the defendant joined the conspiracy typically cannot be included in the relevant conduct inquiry."  Based on this proposition, Hodge argues that conduct occurring before February 1996, the beginning of the conspiracy alleged in the superseding indictment, cannot be attributed to him for sentencing purposes. This argument lacks merit.  In <u>Madkins</u>, the issue was whether to attribute to the defendant the reasonably foreseeable conduct of co-conspirators pursuant to U.S.S.G. § 1B1.3(a)(1)(B).  The relevant conduct attributed to Hodge, however, was his own conduct, and the applicable guidelines provisions are U.S.S.G. § 1B1.3(a)(2) and U.S.S.G. § 1B1.3(a)(1)(A).  Thus, <u>Madkins</u> is inapposite.

24

Anderson makes an argument similar to Hodge's, challenging the relevant conduct attributed to him pursuant to § 1B1.3(a)(2). Anderson's PSR set forth the following ten incidents of relevant conduct:

In February 1993, Oprea Anderson entered into a timber-cutting agreement with Treetop Timber Company to harvest timber on her property for $3000. On March 17, 1994, defendant Anderson and his partner purchased the contract for $500. Anderson then harvested the timber without his partner's knowledge but never compensated Mrs. Anderson, who suffered losses amounting to $3000.

In 1993, Elizabeth Clark and Gerry Ray entered into an agreement with Treetop Timber Company to harvest timber on their property for $50,000. On March 8, 1994, Anderson and a partner purchased the contract for $3,069.08. Without his partner's knowledge, Anderson harvested part of the timber. Clark and Ray received partial payment but were never fully compensated. As a result, they suffered losses totaling $46,500.

In April 1994, Kyle Bradley entered into an agreement with Anderson in which Anderson agreed to haul timber on Bradley's property to a mill in Oklahoma. During a three-week period in July 1994, Anderson took 2000 tons of timber valued at $82,000 from the property of Bradley, Bradley's father, and two private landowners under contract with Bradley. Bradley compensated the private landowners, but never received compensation from

Anderson. According to the PSR, Anderson was indicted for theft as a result of his actions and Bradley obtained a civil judgment against him in the amount of $84,859.70.

In January 1995, Margaret Falsone contracted with Tree South Land and Timber Company to harvest timber on her property for $30,000. Anderson later purchased the contract and harvested the timber. Falsone received only $1,841.63 from Anderson, resulting in a loss of $28,158.37.

In January 1995, Donna and Helen Anderson entered into a timber contract with Tree South Land and Timber Company to harvest timber on their property. Anderson later purchased the contract and harvested the timber. In June 1995, Helen Anderson inspected the property and discovered damage, including litter strewn about the property and damage to the fences and gates. Although Donna and Helen Anderson received checks totaling $8,187.51 and $2,047.03, respectively, from Anderson, they claim to have suffered losses totaling $20,000.

In March 1995, Loren Griswold contracted with Tree South Land and Timber Company to remove a portion of the timber on his property for $5000. Anderson purchased the contract and harvested all the timber on the property, which was valued at $12,000. Anderson also cut approximately fifty feet onto a neighbor's property. Anderson paid Griswold $3,398.33. Griswold suffered losses totaling $8602.

26

In May 1995, John Rummel entered into an agreement with Tree South Land and Timber Company to harvest a portion of the timber on his property for $4000. Anderson purchased the contract and harvested the timber. Rummel later visited the property to find that the timber had been harvested and the land extensively damaged. Anderson paid Rummel $478.32, resulting in a loss to Rummel of $3600.

In May 1995, Victor Weber contracted with Tree South Land and Timber Company to harvest a portion of timber on his property for $28,000. Anderson purchased the contract and harvested the timber. Anderson paid Weber only $4524, resulting in a loss to Weber of $23,476.

In 1995, Elmer Peebles contracted with Anderson to harvest timber on his property. Anderson harvested the timber specified in the contract, and also harvested additional timber. Peebles suffered losses amounting to $5500.

In April 1997, John Clopton received a letter from Anderson stating that Anderson had cut timber on forty acres of Clopton's land. Clopton informed Anderson that he was one of fifteen owners of the property in question and that he was unaware of any agreement to harvest timber on the land. Anderson responded that Christopher Garner had procured the original timber cutting agreement in February 1996 and assigned it to Anderson. Anderson provided a copy of the agreement which contained the forged signatures of Clopton and his aunt. Clopton advised Anderson

27

that he had never met Christopher Garner. Eventually, Clopton and Anderson reached an agreement whereby Anderson would pay the property owners $25,000 for the harvested timber and would replant the tract of land at an additional cost of $4800. Anderson failed to make any payments, resulting in a loss to Clopton of $29,800.

The PSR calculated the loss amount attributable to Anderson by adding the loss that directly resulted from the offense of conviction ($103,797.33) to the loss that resulted from the above-described incidents ($253,496.07), for a total combined loss of $357,293.40. This amount resulted in an increase to Anderson's base offense level of eleven levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

We conclude that the district court clearly erred by including the incident involving Donna and Helen Anderson as relevant conduct for purposes of calculating Anderson's base offense level because, at least on the record before us, this incident involved only property damage and implicated no criminal conduct. Moreover, it is not clear from the record that many of the other incidents described above involve criminal conduct. Anderson argues that they involve mere contract disputes--situations where Anderson did not make the full amount of the payment called for by the contract. Only the incidents involving Bradley, Griswold, Peebles, and Clopton on their face and without further inquiry involve criminal conduct.

As to the remainder of the incidents, the record on appeal is conspicuously devoid of citations to state or federal law that would confirm the criminal nature of Anderson's conduct. The PSR, the transcript of Anderson's sentencing, and the government's appellate brief are all silent on this point.

Because Anderson's base offense level decreases once the incident involving Donna and Helen Anderson is removed from consideration, we vacate Anderson's sentence and remand for resentencing.[5]  On remand, we direct the district court to make specific findings as to the criminal nature and the relevancy of each incident it includes as relevant conduct. See Peterson, 101 F.3d at 385 (remanding for resentencing so that district court could determine whether losses attributed to defendant resulted from criminal conduct).

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Hodge's conviction and sentence.  We AFFIRM Anderson's conviction, but VACATE his sentence, and REMAND to the district court for resentencing pursuant to our instructions.

---

[5]  Subtracting the loss derived from the incident involving Donna and Helen Anderson ($20,000) from the total loss inflicted by Anderson ($357,293.40), results in a one-level decrease to Anderson's base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(K).