United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 29, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

——————————————

No. 05-10236

——————————————

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ROBERT ANTONY LOEFFEL

Defendant - Appellant

_____

Appeal from the United States District Court
for the Northern District of Texas, Fort Worth
No. 4:04-CR-133-ALL

_____

Before KING, SMITH, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Robert Antony Loeffel appeals his

conviction for bank fraud under 18 U.S.C. § 1344 (2000) in

connection with a fraudulent scheme involving proceeds from an

established line of credit with Summit National Bank. Loeffel

challenges: (1) the district court's refusal to specifically

instruct the jury that it must find that Loeffel knew his

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

-1-

statements to the bank were false at the time he made them; (2) the district court's allowance of an impermissible closing argument to the jury concerning the timing of Loeffel's fraudulent intent; and (3) the sufficiency of the evidence as to Loeffel's fraudulent intent submitted at trial to support the jury's verdict. For the following reasons, we AFFIRM Loeffel's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 18, 2004, a federal grand jury for the Northern District of Texas returned a one-count indictment against defendant-appellant Robert Antony Loeffel ("Loeffel"), charging him with knowingly devising and executing a scheme (1) to defraud Summit National Bank ("Summit"), a financial institution with accounts insured by the Federal Deposit Insurance Corporation, and (2) to obtain moneys, funds, and credits owned by and under the custody and control of Summit by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344.[1]

---

[1] 18 U.S.C. § 1344 provides that:

Whoever knowingly executes, or attempts to execute, a scheme or artifice–
      (1) to defraud a financial institution; or
      (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representation, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

A jury trial began on October 4, 2004. According to evidence presented at trial, Loeffel was employed as an accountant and general manager of Progressive Tractor Corporation ("Progressive"), a company involved in the sale and rental of heavy equipment. From May of 1998 to August of 2000, Progressive had an established $2.5 million line of credit with Summit. Summit required Progressive to submit documentation specifically identifying the heavy equipment to be purchased before transferring the necessary funds into Progressive's checking account. Upon purchase, those specific units of heavy equipment would then be listed as collateral to secure the credit line.

At approximately 10:22 a.m. on May 12, 2000, Loeffel faxed a request to Jay Morgan Fry ("Fry") at Summit for an advance of $390,000 on the line of credit to purchase two Volvo articulated dump trucks from American Midwest Equipment Company ("American Midwest"). The fax also included the following supporting documents: (1) an invoice identifying the serial numbers of the trucks to be purchased from American Midwest and (2) a check from Progressive's account made payable to American Midwest in the amount of $411,665 that was dated May 12, 2000 and signed by Loeffel. Upon receipt of this fax, Fry sent Loeffel a security agreement describing the two trucks,[1] which Loeffel promptly

_____

[1] The indictment incorrectly states that the deal involved the purchase of three Volvo articulated trucks from American Midwest. The record exhibits indicate that the discrepancy probably arose from the invoice that included an additional

-3-

signed and faxed back to Fry. Fry then executed the transfer of $390,000 into Progressive's operating account.

That same day, Loeffel wrote two checks for a combined total of $371,000 to the Texas Comptroller to cover back taxes owed by Progressive.[2] According to Fry, without Summit's advance for the purchase of the trucks, Progressive's account did not contain sufficient funds to cover these checks to the Texas Comptroller for the back taxes. Fry testified further that Summit would not have advanced the $390,000 to Progressive on an unsecured basis-- that is, without the assurance that the funds would be used to purchase the trucks that would in turn serve as collateral for the loan. There is no evidence in the record that Loeffel contacted the bank when he wrote the check to pay the back taxes with the advanced funds, rather than to purchase the trucks.

During an audit at Summit in August of 2000, Fry discovered that the check Loeffel had written to American Midwest for $411,665 to the purchase the two trucks had never cleared. Fry called Loeffel for an explanation, and Loeffel admitted that he had used the $390,000 advance to cover back taxes instead of buying the trucks. According to Fry, during this brief telephone

truck, identified by a separate serial number. It is clear, however, that Summit's security agreement with Progressive included only two of the three trucks purchased from American Midwest on this occasion.

[2] According to Loeffel's testimony, the Texas Comptroller concluded a tax audit of Progressive in December of 1999 or early January or February of 2000.

-4-

conversation, Loeffel freely admitted his responsibility and did not mention the involvement of any other Progressive personnel, including Progressive's owner Randy Mathews ("Mathews"). Loeffel told Fry that he had anticipated covering the tax liabilities with money from an account receivable from a company called U.S. Stone that was supposed to be coming in soon after Summit advanced the money. When Progressive failed to collect on the U.S. Stone account, however, Loeffel never contacted Fry to inform him that the two trucks had not been purchased with the funds.

Loeffel then prepared a written memorandum, dated August 16, 2000, that discussed Progressive's cash flow problems at the end of 1999, particularly with respect to collecting on the outstanding U.S. Stone account.[3] He also accepted sole responsibility for the problem and expressed regret at not informing Mathews and Fry about the cash shortages and tax liabilities. Mathews testified that, although he delegated responsibility to Loeffel to obtain financing for the trucks, he never authorized Loeffel to pay the back taxes with those funds.[4]

---

[3] Both Mathews and Fry testified that Fry requested that Loeffel prepare the memorandum. Loeffel testified, however, that he did not recall Fry mentioning this during their telephone conversation and claimed that he first heard about the memorandum from Mathews. Indeed, Loeffel maintained that he wrote the memorandum at the behest of Mathews in order to help Mathews "save face with the bank." 1 R. at 134.

[4] During cross-examination, Mathews discussed the tax liability in the following colloquy:

Testifying on his own behalf, Loeffel maintained that at the time he requested the advance from Summit, he intended to use the funds to purchase the trucks from American Midwest and wrote the checks for the tax liability based on information from Mathews that the money would be forthcoming from U.S. Stone.

On October 5, 2004, the jury found Loeffel guilty of one count of bank fraud in violation of 18 U.S.C. § 1344. Loeffel moved for a judgment of acquittal or for a new trial on October 12, 2004, which the district court denied on October 25, 2004. The district court also denied Loeffel's motion for reconsideration on November 18, 2004. On January 24, 2005, the district court sentenced Loeffel to six months in prison and five years of supervised release. He was also ordered to pay restitution to Summit in the amount of $390,000. Loeffel filed a

---

Q. Now, you were aware that there was a tax audit; is that correct?
A. I was aware there was a tax lien, yes.
Q. Now, do you remember talking to Robert Loeffel about needing to pay those taxes?
A. Yes.
Q. Do you remember telling him that there was going to be a big check from U.S. Stone?
A. Yes. U.S. Stone owed us a rather large sum of money. That's correct.
Q. And that money -- to go ahead and pay the taxes because that money would cover it.
A. I was told that we had the money to pay the taxes. It was going to run us short on funds. And I said, well, if we can get our U.S. Stone check then perhaps we will be okay.

1 R. at 106. Mathews noted that the U.S. Stone account was "in excess of $400,000," which would have covered the entire tax liability. Id. at 107.

timely notice of appeal challenging only his conviction.

## II.  DISCUSSION

On appeal, Loeffel argues that he lacked the requisite intent to defraud at the time he made the representation to Summit about using the funds to purchase the two trucks.  Loeffel contends that on May 12, at the time of the request to Summit, he believed a large payment was forthcoming from U.S. Stone that could be used to pay the back taxes.  When the money from U.S. Stone did not come in as expected, however, Loeffel admittedly used the advanced funds from Summit to pay the tax liability without informing Summit that he was no longer following through with the purchase of the trucks.

Loeffel raises three issues for this court's consideration. First, he asserts that the district court erroneously refused to instruct the jury that, for purposes of bank fraud, a representation is "false" only if it is known to be untrue or is made with reckless indifference to its truth <u>at the time the representation is made</u>.  Second, he contends that the district court compounded this error by allowing the prosecutor to tell the jury during its closing argument that Loeffel could be convicted even if he did not have the intent to deceive at the time of the initial draw request to Summit.  Finally, he argues that the evidence was insufficient to support his conviction for bank fraud under 18 U.S.C. § 1344 because the evidence did not

-7-

support a finding that he intended to deceive Summit at the time he requested the funds.

A.    Requested Jury Instructions

We afford district courts "substantial latitude in formulating jury instructions" and review challenges to jury instructions only for abuse of discretion.  United States v. Monroe, 178 F.3d 304, 307 (5th Cir. 1999).  A district court's refusal to include a specific instruction constitutes reversible error only if all three of the following conditions are met: (1) the requested instruction is substantially correct; (2) the actual charge given to the jury did not substantially cover the content of the proposed instruction; and (3) the omission of the instruction would seriously impair the defendant's ability to present his defense.  United States v. Jensen, 41 F.3d 946, 953 (5th Cir. 1994).  Accordingly, we will not reverse "if the court's charge, viewed in its entirety, is a correct statement of the law which clearly instructs jurors as to the relevant principles of law."  United States v. Hernandez, 92 F.3d 309, 311 (5th Cir. 1999).

The jury was instructed that "[a] representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity."  1 R. at 178.  Loeffel requested that the phrase "at the time the representation is made" be added to the end of that sentence in order to emphasize the relevant time at which Loeffel must have had the requisite fraudulent

intent to be convicted of bank fraud under 18 U.S.C. § 1344.
Although the judge initially agreed to this change, he later
decided that the phrase, while technically correct, was already
implied in his jury charge, which was substantially identical to
the Fifth Circuit pattern jury instruction for bank fraud.[5]  See
FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS § 2.61 (West 2001) ("A
representation is 'false' if it is known to be untrue or is made
with reckless indifference as to its truth or falsity."); see
also Hernandez, 92 F.3d at 311 (finding no abuse of discretion
where the requested instruction was technically "a correct
statement of the law" but already "adequately covered by the
charge given to the jury").  Indeed, this circuit has previously
accepted this definition of "false statement" in the context of
jury instructions for a bank fraud case under 18 U.S.C. § 1344
without the proposed modification.  See United States v. Dillman,
15 F.3d 384, 392 (5th Cir. 1994); United States v. Gunter, 876
F.2d 1113, 1120 (5th Cir. 1989).

Moreover, the jury instruction used in this case did not
impair Loeffel's ability to present his defense to the bank fraud
charge.  Loeffel consistently maintained that he intended to

_____

[5]  The judge specifically stated: "Whether it's in or out,
it's implied.  I'm going to take it out since I've studied the
pattern jury charge and it's not in there, and I'm not going to
put it in there."  1 R. at 159.  Although the pattern jury
instructions are not conclusively correct, this court encourages
their use and considers them a useful guide in fashioning
accurate and consistent instructions.  See United States v.
Tomblin, 46 F.3d 1369, 1380 n.16 (5th Cir. 1995).

purchase the trucks at the time of the fax to Summit because of his expectation that the money from U.S. Stone was forthcoming to cover the back taxes. Given the relatively uncomplicated nature of this case, we presume that the jury was able to follow the instructions and apply the correct legal standard. See United States v. Levine, 80 F.3d 129, 136 (5th Cir. 1996) ("The jury is presumed to have followed the court's instructions."). Therefore, we conclude that the district court did not abuse its discretion by refusing to give the requested jury instruction.

B. Prosecutorial Closing Argument

Loeffel next contends that the failure to give the requested instruction was exacerbated when the district court allowed the government to misstate the law during its closing argument. During his rebuttal argument, the prosecutor stated that "[w]hether you believe [Loeffel] intended to deceive Summit at 10:22 in the morning on May 12 of 2000 or form[ed] the intent later that day or later that month or through July" before being interrupted by Loeffel's objection that this was a "misstatement of the law." 1 R. at 169. Rather than expressly ruling on the objection, the district court made the following remark: "I'm going to give the jury the instructions on the law, and they'll be guided by the legal instructions I give them." Id. As we previously stated, the actual jury instructions given in this case did not constitute reversible error.

This court applies a two-step analysis in reviewing a claim

-10-

of prosecutorial misconduct.  United States v. Insaulgarat, 378 F.3d 456, 461 (5th Cir. 2004), cert. denied, 543 U.S. 1013 (2004).  First, we must determine whether the prosecutor's comment was improper when viewed in context.  Id. (citing United States v. Washington, 44 F.3d 1271, 1278 (5th Cir. 1995)).  If an improper remark was made, we consider three factors when deciding whether to reverse a conviction based on improper prosecutorial argument: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any curative instruction; and (3) the strength of the evidence of the defendant's guilt.  Id.; Levine, 80 F.3d at 135.  "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."  Insaulgarat, 378 F.3d at 461 (quoting United States v. Iredia, 866 F.2d 114, 117 (5th Cir. 1989)).

Although the prosecutor did not complete his remark, given the government's concession that it had to prove intent to defraud at the time Loeffel made the statements to the bank, the prosecutor's argument was improper to the extent it attempted to convey to the jury that it could still convict Loeffel even if he formed the fraudulent intent after the draw request.  See United States v. Shah, 44 F.3d 285, 294 n.16 (5th Cir. 1995) ("The relevant facts must be false when the statement is made, not before or after that time.").  When viewed in the context of the strength of the circumstantial evidence of Loeffel's intent at

the time of the request[6] and the efficacy of the judge's

immediate curative statement,[7] however, we conclude that the

remark neither prejudiced Loeffel's right to a fair trial nor

cast serious doubt on the correctness of the jury's verdict.  See

United States v. Ramirez-Velasquez, 322 F.3d 868, 874 (5th Cir.

2003) (noting that "prosecutorial remarks alone rarely are

sufficient to warrant reversal").

C.    Sufficiency of the Evidence

Finally, Loeffel argues that the evidence was insufficient

to support his conviction for bank fraud under 18 U.S.C. § 1344

because the evidence did not prove beyond a reasonable doubt that

he intended to deceive Summit at the time he requested the

$390,000.  He argues that the intent to deceive must exist at the

time the representations are made.  We review jury verdicts with

---

[6]  Although Loeffel insists that he intended to use the funds to purchase the trucks at the time of the draw request, the evidence adduced at trial amply demonstrated that he was aware of the outstanding tax liability before the draw request and actually wrote two checks to the Texas Comptroller on the same day he received the advance from Summit.  Moreover, according to Fry's testimony, Progressive's account did not have adequate funds to cover the tax liability until it received the advance on May 12.  It is well established that circumstantial evidence can support an inference of criminal intent.  See United States v. Stevenson, 126 F.3d 662, 665 (5th Cir. 1997); United States v. Restivo, 8 F.3d 274, 280-81 (5th Cir. 1993).

[7]  During his charge, the judge also expressly informed the jury of its "duty to base [its] verdict solely upon the evidence received during the trial and the law as given and explained to [it] by the Court."  1 R. at 171.  The judge also reminded the jury that "[w]hat the lawyers say is not binding upon [it]."  Id. at 172.

-12-

great deference and evaluate the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences and credibility choices.[8]  United States v. McCauley, 253 F.3d 815, 818 (5th Cir. 2001).  "The evidence is sufficient to support a guilty verdict if a rational jury could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Dupre, 117 F.3d 810, 818 (5th Cir. 1997); see also United States v. Anderson, 174 F.3d 515, 522 (5th Cir. 1999).  Moreover, the jury is free to choose among reasonable constructions of the evidence, and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt to sustain a conviction.  Anderson, 174 F.3d at 522; see also United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd, 462 U.S. 356 (1983).

In order to establish the elements of bank fraud, the government must prove beyond a reasonable doubt that the defendant "knowingly executed or attempted to execute a scheme or artifice 1) to defraud a financial institution or 2) to obtain any property owned by, or under the custody or control of a financial institution by means of false or fraudulent pretenses,

---

[8]  This standard of review applies here because, although Loeffel did not move for a judgment of acquittal at the close of the government's case or at the close of all the evidence, he moved for a judgment of acquittal within seven days after the jury returned its verdict.  See FED. R. CRIM. P. 29(c); United States v. Allison, 616 F.2d 779, 784 (5th Cir. 1980).

representations or promises." McCauley, 253 F.3d at 819 (citing United States v. Odiodio, 244 F.3d 398, 400-02 (5th Cir. 2001)); see 18 U.S.C. § 1344. "The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself." United States v. Doke, 171 F.3d 240, 243 (5th Cir. 1999).

The government's theory--which the jury apparently believed in reaching a guilty verdict--was that Loeffel misrepresented to Summit that Progressive would use the funds to purchase trucks in order to secure the advance to pay the back taxes. The evidence presented at trial demonstrated that Loeffel was aware at the time of the request that Summit would not transfer funds to Progressive's account on an unsecured basis.[9] Indeed, there is nothing in the record to suggest that Summit had ever extended funds on Progressive's line of credit without simultaneously arranging for a security interest in the underlying equipment being purchased with the funds. The government also submitted the two checks that Loeffel wrote to the Texas Comptroller totaling $370,000 on the same day of the draw request. According to Fry's testimony, Progressive did not have sufficient funds to

---

[9] Fry stated that Summit would not have loaned the $390,000 on an unsecured basis because Progressive was not credit worthy. 1 R. at 93.

-14-

cover these checks until the $390,000 was transferred into its

operating account on May 12.[10]

This court has sustained guilty verdicts for bank fraud

under 18 U.S.C. § 1344 where the defendant knowingly

misrepresents how funds will be used in order to induce a bank to

authorize a particular loan or advance. See Anderson, 174 F.3d

at 524 (finding sufficient evidence to support the jury's verdict

where the defendant "knowingly made a misrepresentation that

influenced the bank's decision with the intention of obtaining

something of value from the bank--the use of the bank's money for

longer than [the defendant] would have otherwise been entitled to

it"); Dupre, 117 F.3d at 820 (holding that "a reasonable jury was

entitled to conclude that appellants made false representations

regarding the use of the $1.5 million to induce the bank to

approve the withdrawal"); cf. United States v. Dobbs, 63 F.3d

391, 396 (5th Cir. 1995) (noting that the jury could conclude

that the defendant knowingly "divert[ed] funds that properly

belonged to [the] bank into his own ranch operation" when the

---

[10] On direct examination, Mathews testified that more than $700,000 was available in May of 2000 to pay off the back taxes without using the funds advanced from Summit. See 1 R. at 103. During cross-examination, however, Mathews slightly altered his position and stated that paying the tax liability would cause Progressive to be "short on funds" but that if the U.S. Stone account came in as expected "then perhaps we will be okay." Id. at 106. In light of the standard of review applied in evaluating the sufficiency of the evidence to sustain a jury verdict, we decline to supplant the jury's decision to credit the testimony of Fry over that of Mathews on this issue. See McCauley, 253 F.3d at 818.

defendant sold the cattle securing the bank's loan).  In this case, Loeffel's failure to inform Summit that he would be using the advanced funds to pay the tax liability, rather than to follow through with the purchase of the trucks from American Midwest, supports an inference that he was aware of his wrongdoing at the time of the draw request.  Moreover, the content of Loeffel's memorandum suggests that he knew it was inappropriate to use the funds from Summit to pay the tax liability but hoped he could cover his tracks once the U.S. Stone account came in.  Even if the U.S. Stone account had eventually arrived, however, the violation of § 1344 occurred at the moment Loeffel diverted the advance from Summit to an impermissible use. See Anderson, 174 F.3d at 524 ("That [the defendant] later substituted new collateral once he was confronted with the missing collateral is irrelevant because the crime was already completed.").

We are not persuaded by Loeffel's reliance on the Eleventh Circuit's decision in United States v. McCarrick, 294 F.3d 1286 (11th Cir. 2002).  In McCarrick, the defendant received a $49,000 loan to expand his automobile repair business, of which $35,000 was to be used for purchasing five specific pieces of equipment, including a spray paint booth, and the remaining $14,000 was to be used for working capital. Id. at 1288.  After purchasing four of the five pieces of equipment, the defendant testified that he deposited the remaining check for $12,679 into his account with

-16-

the intent to purchase the spray paint booth, which had been ordered but not yet delivered at the time. Id. at 1289. Over the next month, the defendant's business experienced financial difficulties, prompting him to use the $12,679 to cancel the order for the spray paint booth and use the funds to "keep his business afloat." Id. In finding the evidence insufficient to convict under § 1344, the court noted that "[t]he evidence at trial consisted entirely of events that occurred subsequent to the signing of the loan documents" and that the evidence of the defendant's conduct subsequent to signing the loans did "not support a rational inference of the requisite prior intent, beyond a reasonable doubt." Id. at 1291 (emphasis added).

Even if this court were bound by the Eleventh Circuit's decision in McCarrick,[11] we conclude that the instant case does not present a situation in which the government proffered evidence that related only to conduct subsequent to the draw request; rather, the jury was presented with evidence that could support a rational inference that Loeffel formed the intent to deceive Summit prior to his draw request. According to Loeffel's testimony at trial, the tax audit by the Texas Comptroller was completed around December of 1999 or early January or February of 2000. 1 R. at 122. Because Loeffel did not send the fax to

---

[11] Although we often look to our sister circuits for persuasive authority, "the Fifth Circuit is in no way bound by decisions rendered by other circuits." United States v. Dawson, 576 F.2d 656, 659 (5th Cir. 1978).

-17-

Summit requesting the $390,000 advance until May 12, 2000,--at least three months after the tax audit--the jury could have reasonably inferred that Loeffel was fully aware of the tax liability at the time of the draw request and made the misrepresentation to induce Summit to disburse the funds.  See Anderson, 174 F.3d at 524; Dupre, 117 F.3d at 820.  Furthermore, Loeffel wrote two checks to the Texas Comptroller totaling $371,000 on the very same day that Summit transferred the funds into Progressive's account, which Fry testified had previously lacked adequate funds to cover the tax liability.  Therefore, we conclude that there was sufficient evidence to support the jury's finding that Loeffel had the requisite fraudulent intent at the time he made the draw request to Summit.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM Loeffel's conviction.